# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | | |
|---|---|---|---|
| MOZELL BROWN, | : | | |
| *Individually and as the Personal Representative* | : | | |
| *of the Estate of Reuel Griffin*, | : | Civil Action No.: | 14-750 (RC) |
| | : | | |
| Plaintiff, | : | Re Document Nos.: | 282, 284, 285, 286 |
| | : | | |
| v. | : | | |
| | : | | |
| DISTRICT OF COLUMBIA, *et al.*, | : | | |
| | : | | |
| Defendants. | : | | |

## MEMORANDUM OPINION

**DENYING DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT (ECF NO. 284);
GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT (ECF NO. 285);
GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (ECF NO. 282);
AND DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT (ECF NO. 286)**

## I. INTRODUCTION

Plaintiff Mozell Brown, representing the estate of Reuel Griffin, brings this action against

the District of Columbia and several other Defendants based on the care Griffin received during

his commitment to Saint Elizabeths Hospital.[1]  Three groups of Defendants brought motions for

summary judgment.  First, the District moves for partial summary judgment of Plaintiff's claim

for denial of substantive due process under the Fifth Amendment and 42 U.S.C. § 1983 based on

causation.[2]  Second, several higher-level hospital employees move for summary judgment of

Plaintiff's 1983 claim based on qualified immunity, and of Plaintiff's negligence claim based on

---

[1] *See* Min. Order (Apr. 17, 2017) ("Mozell Brown shall be substituted as the Personal
Representative of the Estate of Reuel Griffin in this matter").

[2] D.C.'s Mem. P. & A. Supp. Partial Mot. Summ. J., ECF No. 284-1 ("D.C. Mem."); Pl.'s
Opp'n D.C.'s Mot. Partial Summ. J. ("Pl.'s D.C. Opp'n"), ECF No. 296; D.C.'s Reply Pl.'s
Opp'n D.C.'s Mot. Summ. J. ("D.C. Reply"), ECF No. 303.

failure to prove duty or breach.[3]  Third, several lower-level hospital employees move for summary judgment of Plaintiff's 1983 claim based on qualified immunity.[4]  Plaintiff moves for partial summary judgment on liability of the 1983 and negligence claims against the District and several individual Defendants.[5]  For the reasons given below, the qualified-immunity defenses succeed and the motions are granted to that extent, but the motions are otherwise denied.

## II.  FACTUAL BACKGROUND

### A.  Saint Elizabeths' Payments for External Care

Saint Elizabeths Hospital "is the public psychiatric hospital for the District of Columbia" operated by the D.C. Department of Behavioral Health ("DBH").  Pl.'s Statement of Undisputed Material Facts (Corrected) ("Pl.'s SUMF") ¶¶ 1, 3, ECF No. 289-2.  During the relevant time, the following individuals held the following roles at Saint Elizabeths: Patrick Canavan: CEO; Anthea Seymour: COO; Bernard Arons: Medical Director; Edger Potter: Supervisory General Medical Officer.  For patients' medical care, some routine medical services are provided on site,

---

[3] Mem. P. & A. Supp. Mot. Summ. J. by Defs. Canavan, Seymour, Arons & Potter ("Defs.' Higher-Level Mem."), ECF No. 285-1; Pl.'s Opp'n Mot. Summ. J. by Defs. Canavan, Seymour, Arons & Potter ("Pl.'s Higher-Level Opp'n"), ECF No. 295; Reply Pl.'s Opp'n Mot. Summ. J. by Defs. Canavan, Seymour, Arons & Potter ("Defs.' Higher-Level Reply"), ECF No. 302.

[4] Defs.' Mem. P. & A. Supp. Mot. Summ. J. ("Defs.' Lower-Level Mem."), ECF No. 282-1; Pl.'s Opp'n Defs.' Mot. Summ. J. Dkt. 282-1 ("Pl.'s Lower-Level Opp'n"), ECF No. 297; Defs.' Reply Pl.'s Opp'n Defs.' Mot. Summ. J. 282-1 ("Defs.' Lower-Level Reply"), ECF No. 301.

[5] Pl.'s Mem. P. & A. Supp. Mot. Partial Summ. J. (Corrected) ("Pl.'s Mem."), ECF No. 289-1; Defs.' Mem. P. & A. Opp'n Pl.'s Mot. Summ. J. ("Defs.' Opp'n"), ECF No. 293; Pl.'s Reply Supp. Mot. Partial Summ. J. (Corrected) ("Pl.'s Reply"), ECF No. 311-2.  Plaintiff served corrected versions of the briefing for this motion.  *Compare* Pl.'s Mem. *and* Pl.'s Reply *with* Pl.'s Mot. Partial Summ. J., ECF No. 286, *and* Pl.'s Reply Supp. Mot. Partial Summ. J., ECF No. 309.  Because Defendants have not objected to these corrected versions, and in fact responded to the corrected version of Plaintiff's opening brief, *see, e.g.*, Defs.' Opp'n at 1 n.1 (citing ECF No. 289-1 as Plaintiff's memorandum), the Court will treat the corrected versions as the operative versions.

but patients must be referred to external providers for "non-psychiatric specialty medical services." *Id.* ¶ 8.

As part of the scheduling process for external medical appointments, "[t]he hospital routinely provided a Not Guilty By Reason Of Insanity patient's Medicaid or Medicare [sic], if the patient had a Medicaid or Medicare number." Defs.' Resp. Pl.'s Statement of Material Facts ("Defs.' SUMF Resp.") ¶ 27, ECF No. 293-2 (quoting District's interrogatory response). Antoinette Quander-Clemons was responsible for scheduling outside appointments but was not responsible for billing; nurse Bernadeane Greene acted as Quander-Clemons's assistant during the relevant time.  Defs.' Lower-Level SUMF ¶¶ 31, 38, ECF No. 282-3.  Greene scheduled the August 4, 2011 appointment discussed below for which Griffin was not seen due to lack of insurance.  *Id.* ¶ 39.

The federal Medicaid statute has an exclusion for institutions for mental diseases ("IMD exclusion").  Under the IMD exclusion, Federal Financial Participation ("FFP")—funds paid by the federal government to states for Medicaid expenditures—is generally unavailable for "payments with respect to care or services for any individual who has not attained 65 years of age and who is a patient in an institution for mental diseases." *Virginia Dep't of Med. Assistance Servs. v. HHS*, 678 F.3d 918, 919 (D.C. Cir. 2012) (quoting 42 U.S.C. § 1396d(a)(B)).  The parties agree that the IMD exclusion applies to Saint Elizabeths.  Defs.' SUMF Resp. ¶ 22. Several high-level officials at Saint Elizabeths were aware of the IMD exclusion before and during the relevant events.  *See, e.g.*, Pl.'s SUMF ¶¶ 26.  Despite the IMD exclusion, the D.C. Department of Healthcare Finance ("DHCF") "generally paid" outpatient medical claims for IMD patients because DHCF does not track whether claims are submitted for IMD patients. Pl.'s Higher-Level SUMF Resp. ¶ 4, ECF No. 295-1.

An "issue regarding Medicaid federal fund participation availability (FFP) . . . arose in late Spring 2011 when the Hospital had difficulty scheduling external appointments."  Defs.' SUMF Resp. ¶ 34; *see also id.* ¶ 36 (acknowledging that some "emails do suggest that Saint Elizabeths was having difficulty scheduling outside medical appointments").  Multiple individuals testified that external providers refused to accept Medicaid as the payment method for Saint Elizabeths patients.  *See, e.g.*, *id.* ¶¶ 32–34.  Plaintiff points to numerous alleged instances of patients experiencing delays in receiving external medical treatment throughout 2011 and 2012, though Defendants dispute the cause of delays for many of these.  *See* Defs.' SUMF Resp. ¶¶ 37–38.  Between April 2011 and April 2012, many emails among Saint Elizabeths and District employees, including upper management at Saint Elizabeths, refer to difficulties getting external medical appointments because Medicaid was not being approved or accepted.  *See* Pl.'s SUMF ¶ 41.  The District "did not generally obtain financing or payment for external medical care before scheduling or transporting patients to external medical appointments until it was notified that it needed to pay for its IMD patients."  *Id.* ¶ 42.  Defendants cite evidence showing efforts from Saint Elizabeths and District personnel to figure out how to pay for external care for IMD-exclusion patients.  *See, e.g.*, Defs.' Higher-Level SUMF ¶¶ 15, 17, ECF No. 285-3.

In September 2011, another method to pay for external medical care was developed: Purchase Cards ("P-Cards"), which were essentially credit cards, could be used.  Pl.'s SUMF ¶ 44.  P-Cards were used to pay for at least one instance of external care in 2011, although there is testimony that the P-Cards had problems, such as some external providers not accepting it.  *Id.* In June 2013, Saint Elizabeths began using Letters of Financial Responsibility ("LOFR") to

directly pay for external care.  *Id.* ¶ 45.  "Today, the LOFR remains the protocol in place to pay for external care."  *Id.*

### B.  Griffin's Care Relating to External Appointments

"Reuel Griffin was involuntarily committed to St. Elizabeths Hospital in 1983 pursuant to D.C. Code § 501(d)(1) after he was adjudicated Not Guilty By Reason of Insanity (NGBRI) on charges of Destroying Property and Assault."  Pl.'s SUMF ¶ 47.  Griffin was transferred to D.C. Jail in March 2010 on charges of inappropriately touching a staff member, and he returned to Saint Elizabeths on February 24, 2011.  Defs.' SUMF Resp. ¶¶ 48, 51.  While at the Jail in mid-November 2010, Griffin suffered a Lisfranc fracture in his left foot.  *Id.* ¶ 49.[6]  Also while in Jail, Griffin's Medicaid coverage lapsed and was not renewed.  Pl.'s Higher-Level SUMF Resp. ¶ 2.[7] On the day Griffin returned to Saint Elizabeths, Dr. Danilo Garcia did a physical evaluation of Griffin in which he "noted that Griffin had gait abnormality and walked with a limp."  Pl.'s SUMF ¶ 51.  "On February 25, 2011, Dr. Garcia made a referral for an x-ray and an orthopedic consult for Griffin's foot and knee because he believed Griffin needed medical treatment from orthopedics.  The x-ray was performed onsite at Saint Elizabeths Hospital and showed abnormal widening between the 1st and 2nd metatarsal."  *Id.* ¶ 52 (citations omitted).

Subsequently, Dr. Richard Smith became Griffin's primary doctor.  *Id.* ¶ 54.  "On March 1, 2011, Dr. Smith reviewed the x-ray of Mr. Griffin's left foot and ankle, and noted that it showed 'some probable effusion of the ankle joint and chronic changes of the foot including

---

[6] Defendants try to dispute this fact, but one of their responses to a request for admission was: "Defendants respond that Plaintiff sustained a Lisfranc fracture in mid-November 2010." Pl.'s Mem. Ex. 46 at 6, ECF No. 289-8.

[7] Whether Griffin's Medicaid coverage was active or lapsed does not, at this time and for these motions, appear to be material.  Similarly, the details of the District's decisions regarding allowing NGBRI patients to enroll in Medicaid, *see, e.g.*, Defs.' Higher-Level SUMF ¶¶ 21–24, do not appear to be material at this time.

arthritis of the M-P joint.'" *Id.* Smith referred Griffin for an orthopedics appointment, but it was not scheduled.[8] *Id.* On May 25, 2011, "Smith observed that Griffin was experiencing 'increasing discomfort in his knees' and requested an MRI for both of Mr. Griffin's knees." *Id.* ¶ 55. The MRI appointment was not made. *Id.* "On July 30, 2011, after noting that there was increased swelling and pain in Mr. Griffin's left foot, Dr. Smith sent Mr. Griffin to the Emergency Room at Washington Hospital Center for evaluation. The x-ray at WHC confirmed the lisfranc fracture." *Id.* ¶ 56. "[A]n orthopedics consult to WHC was placed by Dr. Smith on July 31, 2011, but the referral to the WHC orthopedic clinic never occurred . . . ." *Id.* ¶ 57. On August 4, 2011, Smith sent Griffin out for an MRI of his knees, but Griffin was not seen because he did not have insurance. Defs.' SUMF Resp. ¶ 58 (not disputing that Griffin "was rejected because he did not have insurance"). On October 6, Smith requested an orthopedics referral for Griffin's knees and foot. Pl.'s SUMF ¶ 59. "On October 25, 2011, Dr. Garcia saw Griffin and noted the continuing left foot deformity and his foot fracture." *Id.* ¶ 60. On January 11, 2012, Potter recommended an orthopedic referral "to determine whether Griffin would benefit from a knee replacement." Defs.' SUMF Resp. ¶ 61. Griffin never received surgery for his Lisfranc fracture. *Id.* ¶ 65. There is evidence that Griffin had difficulty walking during this time. *Id.* ¶ 66. Griffin died on January 31, 2012, as discussed in more detail below. Pl.'s SUMF ¶ 69.

### C. Griffin's Internal Care at Saint Elizabeths

Numerous individuals participated in Griffin's care relevant to the asserted claims. "Dr. [Peter] Thura prescribed '600 milligram PO3 times a day as-needed for joint pain'" on

---

[8] For several instances of outpatient care being ordered for Griffin that never occurred, Plaintiff cites some evidence, such as deposition testimony or notes from Griffin's medical records (the admissibility of which has not been determined), indicating that Griffin was not seen due to insurance issues. *See, e.g.*, Pl.'s Mem. Ex. 8, Quander-Clemons Dep. 94:16–19, ECF No. 289-3 (testifying that Quander-Clemons told Smith that "we can't schedule appointments with Mr. Griffin because he doesn't have any insurance").

September 25, 2011.  Defs.' Lower-Level SUMF ¶ 6, ECF No. 282-3.  Potter treated Griffin on November 10, 2011, and January 11, 2012.  *Id.* ¶ 1.  "Dr. Potter examined Griffin's peripheral joints, performed an arthrocentesis on Griffin's knee, collected 200cc of bloody fluid from the swollen portion of his knee, and injected his knee with lidocaine and Kenalog."  *Id.* ¶ 2.

Enyioma Anyatonwu was a charge nurse for Griffin's ward at Saint Elizabeths from October 13, 2011, through his death.  Pl.'s SUMF ¶ 70.  Florence Nwonye and Amma Pokuaah were nurse Team Leaders for Griffin's unit.  *Id.* ¶¶ 71–72.  Griffin used crutches for at least some of the time between February 2011 and January 2012.  *See id.* ¶¶ 97–98.  He also occasionally shadowboxed, sometimes "very hard to the point of him almost losing his balance," and at least one nurse, Anyatonwu, would tell him to sit down to avoid injuring himself.[9]  *See id.* ¶ 99; Defs.' Lower-Level SUMF ¶¶ 14, 17, 22.  At least one nurse, Nwonye, "encouraged Griffin to walk with crutches rather than b[ear] weight on his foot."  Defs.' Lower-Level SUMF ¶ 16.  Pokuaah instructed Griffin to elevate his feet when possible.  *Id.* ¶ 19.

Evidence suggests that Griffin presented some difficulties for the nurses.  Regarding Griffin's self-care, there is evidence that Griffin, in addition to shadowboxing, would walk without the wheelchair he had been prescribed and participated in a dance contest.  Defs.' Opp'n at 31.  Regarding the safety of treating Griffin, there is evidence that Griffin had physical altercations with other patients that included striking other patients, experienced delusions, and slapped a nurse.  *See id.* at 31–32.

The Saint Elizabeths nursing pain assessment policy required that "[a]ny time a patient makes a complaint regarding pain it is the nurse's responsibility to conduct a full pain

---

[9] "Shadowboxing is a combat sport exercise in which a person throws punches at the air as though there is an opponent."  *Shadowboxing*, Wikipedia, https://en.wikipedia.org/wiki/Shadowboxing.

assessment and to complete the pain assessment form." Pl.'s SUMF ¶ 77. Pain assessments do not require visualizing the area in all instances. Defs.' SUMF Resp. ¶ 80. Between February 2011, and January 31, 2012, Griffin was given 282 administrations of Motrin and 14 pain assessments were conducted. Pl.'s SUMF ¶¶ 84–85. Nwonye gave at least 19 of these Motrin administrations and never filled out a pain assessment form. *Id.* ¶ 95. Pokuaah gave at least 3 of these Motrin administrations in March and May 2011 without completing a pain assessment. *Id.* ¶ 110. From November 2011 through January 2012, Griffin was given 59 administrations of Tramadol for pain with 11 pain assessments completed. *Id.* ¶ 89. Anyatonwu and Nwonye had copied and pasted old nursing notes instead of drafting new ones and were eventually removed from Griffin's unit. *Id.* ¶ 91. Plaintiff cites documents, which may or may not be admissible, indicating that Griffin's nurses did not follow Saint Elizabeths policy regarding pain assessments. *See* Pl.'s SUMF ¶¶ 111–14. The parties dispute whether, and to what extent, Griffin refused to take his medication. *See, e.g.*, Pl.'s Lower-Level SUMF Resp. ¶ 15, ECF No. 297-1.

During the last ten days of Griffin's life, he was regularly given Motrin and Tramadol. *See* Pl.'s SUMF ¶ 115. In January 2012, Griffin frequently rated his pain an eight on a ten-point scale. Defs.' SUMF Resp. ¶ 76. "Anyatonwu noted on January 30, 2012 that Reuel Griffin had gained 12 pounds in a short period of time." Pl.'s SUMF ¶ 94. On the morning of January 31, 2012, Griffin stated that he could not move and his legs were in pain. *Id.* ¶ 115. Griffin had 3+ pitting edema at this time. *Id.* ¶ 116. The extent to which Griffin's legs were examined in the days leading to his death is disputed, but the only evidence cited by Defendants to dispute the assertion that Griffin's legs were not physically assessed or visualized during his final days is citation to medical records from January 31, 2012, the day Griffin died. Defs.' SUMF Resp.

¶ 119.  On that day, medical records indicate that at some time in the morning, nurse Bernadette Williams documented edema in Griffin's feet and immediately notified Daphne Jackson, the nursing supervisor; Anyatonwu examined Griffin around 6:51 a.m. and requested that a doctor see Griffin; at Anyatonwu's request, Thura examined Griffin at around 7:00 or 7:28 a.m., with Anyatonwu telling Thura "that Griffin had chronic leg pain and that his legs were swelling"; Thura prescribed Motrin and a diuretic to address leg swelling; at 8:20 a.m., a psychiatrist was told by "staff" that Griffin complained of shortness of breath, and the psychiatrist "informed the staff to call a Code Blue"[10]; several unsuccessful calls were made to get a doctor between 8:46 a.m. and 8:59 a.m. after Griffin had shortness of breath and vomiting and rated his pain a ten out of ten; some of these calls were likely made by Jackson, who ordered Williams to bring a crash cart to Griffin's room; and it appears that a Code Blue (or, indirectly, 911) was called at 9:07 a.m.  Pl.'s SUMF ¶ 120; Defs.' Lower-Level SUMF ¶¶ 7–9, 23–25.  Plaintiff cites at least some non-expert testimony that the Code Blue should have been called at 8:46 a.m.  Pl.'s SUMF ¶ 122.  Griffin was pronounced dead at 10:07 a.m.  *Id.* ¶ 120.

The parties appear to agree that Griffin's cause of death was cardiac related, although they dispute the exact cardiac issue.  No medical records show cardiac care performed on Griffin between February 2011 and January 2012.  D.C. SUMF ¶ 1, ECF No. 284-3.  None of Griffin's referrals for external appointments concerned cardiac care.  *Id.* ¶ 2.  Plaintiff's cardiology expert opines that Griffin was overprescribed Motrin, a type of NSAID (nonsteroidal anti-inflammatory drug), which "contributed to the cardiovascular disease."  Pl.'s D.C. SUMF Resp. ¶ 6, ECF No. 296-1.

---

[10] Calling a Code Blue signifies an emergency requiring immediate response in a potentially life-threatening situation.  Defs.' Lower-Level Mem. at 7 n.4.

### D.  Procedural Background

Plaintiff filed the complaint for this case on April 29, 2014.  It includes four counts:
medical negligence (Count I); wrongful death (Count II); Survival Act (Count III); and section
1983 (Count IV).  Compl., ECF No. 1.  As described above, Defendants move for summary
judgment on various grounds for Counts I and IV, and Plaintiff moves for partial summary
judgment on liability for Counts I and IV.

## III.  LEGAL STANDARD

A court may grant summary judgment when "the movant shows that there is no genuine
dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.
R. Civ. P. 56(a).  A "material" fact is one capable of affecting the substantive outcome of the
litigation, *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986), while a dispute is
"genuine" if there is enough evidence for a reasonable jury to return a verdict for the non-
movant, *see Scott v. Harris*, 550 U.S. 372, 380 (2007).

The principal purpose of summary judgment is to streamline litigation by disposing of
factually unsupported claims or defenses and determining whether there is a genuine need for
trial.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).  The movant bears the initial
burden of identifying portions of the record that demonstrate the absence of any genuine issue of
material fact.  *See* Fed. R. Civ. P. 56(c)(1); *Celotex*, 477 U.S. at 323.  In response, the non-
movant must point to specific facts in the record that reveal a genuine issue that is suitable for
trial.  *See Celotex*, 477 U.S. at 324.  In considering a motion for summary judgment, a court
cannot make credibility determinations or weigh the evidence.  *See Czekalski v. Peters*, 475 F.3d
360, 363 (D.C. Cir. 2007).  All underlying facts and inferences must be analyzed in the light
most favorable to the non-movant.  *See Anderson*, 477 U.S. at 255. That said, conclusory

assertions offered without any evidentiary support do not establish a genuine issue for trial. *See Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999).

"'The burden is always on the movant to demonstrate why summary judgment is warranted. The nonmoving party's failure to oppose summary judgment does not shift that burden.' The District Court 'must always determine for itself whether the record and any undisputed material facts justify granting summary judgment.'" *Winston & Strawn, LLP v. McLean*, 843 F.3d 503, 505 (D.C. Cir. 2016) (quoting *Grimes v. District of Columbia*, 794 F.3d 83, 97 (D.C. Cir. 2015) (Griffith, J., concurring)).

## IV.  ANALYSIS

The Court first lays out the law applicable to the parties' arguments. Defendants' three motions are then addressed, which cover, in order, municipal liability, liability for higher-level Saint Elizabeths employees on more supervisory and administrative bases, and liability for caregivers and lower-level administrators. Last, Plaintiff's motion for partial summary judgment on liability is addressed to the extent the issues are not resolved by the Court's decisions on Defendants' motions. Ultimately, the Court denies the District's motion for partial summary judgment, grants Defendants' motion for summary judgment for the higher-level employees on qualified-immunity grounds only, grants Defendants' motion for summary judgment for the lower-level employees, and denies Plaintiff's motion for partial summary judgment.

### A.  Legal Frameworks

The four motions largely turn on two legal issues: the Fifth-Amendment right to medical care of a patient committed after a Not Guilty by Reason of Insanity ("NGBRI") finding (via 42 U.S.C. § 1983), and qualified immunity. The following explanation of these legal frameworks will govern the Court's analysis of the parties' motions.

11

1.  Fifth-Amendment Right to Medical Care

The Due Process Clause of the Fifth Amendment imposes on "the State . . . an affirmative duty to ensure the safety and general well-being of an involuntarily committed mental patient." *Harvey v. District of Columbia*, 798 F.3d 1042, 1050 (D.C. Cir. 2015) (citing *Youngberg v. Romeo*, 457 U.S. 307 (1982)).  This includes an "affirmative duty . . . to provide necessary medical care."  *Id.*  "To constitute a substantive due process violation, the defendant official's behavior must be 'so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience.'"  *Id.* at 1049 (quoting *Estate of Phillips v. District of Columbia*, 455 F.3d 397, 403 (D.C. Cir. 2006)).  "This stringent requirement exists to differentiate substantive due process, which is intended only to protect against arbitrary government action, from local tort law."  *Butera v. District of Columbia*, 235 F.3d 637, 651 (D.C. Cir. 2001).  Merely proving negligence is "categorically beneath the threshold of constitutional due process."  *Id.* (quoting *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 849 (1998)).

The parties dispute what constitutes conscience-shocking care for individuals committed to psychiatric hospitals by way of NGBRI.  Plaintiff argues that the professional-judgment standard applies.  *See, e.g.*, Pl.'s Mem. at 8 ("Under *Youngberg v. Romeo*, 457 U.S. 307, 323 (1982), liability against a governmental agency for failure to provide safety and general well-being for involuntarily committed mental patients 'may be imposed only when the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment.'" (quoting *Costa v. Bazron*, 456 F. Supp. 3d 126, 134 (D.D.C. 2020))).  Defendants sometimes advocate for the more protective deliberate-indifference standard and sometimes appear to accept the professional-judgment standard.  *Compare, e.g.*, Defs.' Higher-Level Mem.

at 18 ("These are not the actions of officials who are deliberately indifferent to the needs of NGBRI patients."), *and* Defs.' Lower-Level Mem. at 17 ("An individual in state custody states a claim for inadequate medical care under the Fifth Amendment's Substantive Due Process Clause if he or she can show (1) a serious medical need, and (2) that government officials acted with deliberate indifference toward that need."), *with* Defs.' Opp'n at 19 ("Plaintiff may be correct [that the professional-judgment standard applies in this case], but the professional judgment standard is not meaningfully more stringent than the deliberate indifference standard." (citing *Jordan v. District of Columbia*, 161 F. Supp. 3d 45, 57–58 (D.D.C. 2016), *aff'd*, 686 F. App'x 3 (D.C. Cir. 2017))).  No party cites a case from this circuit that is precisely on point.

This Court recently discussed these standards at length to determine what standard applies to civilly committed individuals.  After acknowledging that it is "debatable" whether the professional-judgment standard "is meaningfully more stringent" than the deliberate-indifference standard, and "that the precise standard to apply when assessing a civilly committed individual's substantive due process claim is not firmly established in this circuit," the Court decided to apply the professional-judgment standard to civilly committed individuals.  *Jordan*, 161 F. Supp. 3d at 54–59.

Patients committed via NGBRI are sufficiently analogous to civilly committed patients to justify the same standard.  "The purpose of commitment following an insanity acquittal, like that of civil commitment, is to treat the individual's mental illness and protect him and society from his potential dangerousness.  The committed acquittee is entitled to release when he has recovered his sanity or is no longer dangerous." *Jones v. United States*, 463 U.S. 354, 368 (1983).  The D.C. statute governing NGBRI states that persons acquitted solely due to insanity "shall be committed to a hospital for the mentally ill until such time as he is eligible for release."

D.C. Code § 24-501.  Commitment following NGBRI, therefore, is not intended to punish.  *See*

*Jones*, 463 U.S. at 369 ("As he was not convicted, he may not be punished.  His confinement

rests on his continuing illness and dangerousness.").  Accordingly, NGBRI commitment is

analogous to civil commitment and should be analyzed under the professional-judgment standard

for violations of the Fifth Amendment's Due Process Clause.

### 2.  42 U.S.C. § 1983

Claims for constitutional violations may be brought under 42 U.S.C. § 1983:

> Every person who, under color of any statute, ordinance, regulation, custom, or
> usage, of any State or Territory or the District of Columbia, subjects, or causes to
> be subjected, any citizen of the United States or other person within the
> jurisdiction thereof to the deprivation of any rights, privileges, or immunities
> secured by the Constitution and laws, shall be liable to the party injured in an
> action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983.  "'Tort law proximate cause principles apply to § 1983 action[s],' and

'[p]roximate cause requires both a causal relationship between the [wrongful] act and the

plaintiff's injury and foreseeability of the injury.'"  *Brown v. Hill*, 174 F. Supp. 3d 66, 74

(D.D.C. 2016) (quoting *Elkins v. District of Columbia*, 610 F. Supp. 2d 52, 61 (D.D.C. 2009));

*accord Hampton v. District of Columbia*, 764 F. Supp. 2d 147, 150 (D.D.C. 2011) ("[A] plaintiff

alleging a violation of a constitutionally protected interest under § 1983 must demonstrate that

the violation was the proximate cause of the plaintiff's injury.").

"Because vicarious liability is inapplicable to *Bivens* and § 1983 suits, a plaintiff must

plead that each Government-official defendant, through the official's own individual actions, has

violated the Constitution."  *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009).  Accordingly, "[i]n order

for the District to be held liable for the acts of a wrongdoer under its authority, a plaintiff must

show that the District was the 'moving force' behind the alleged constitutional deprivation, as

evidenced by an official policy or 'practices so persistent and widespread as to practically have

the force of law.'"  *Moreno v. District of Columbia*, 925 F. Supp. 2d 93, 99 (D.D.C. 2013)

(cleaned up) (quoting *Monell v. N.Y. City Dep't of Social Servs.*, 436 U.S. 658, 694 (1978); and

*Connick v. Thompson*, 563 U.S. 51, 61 (2011)); *see also Smith v. District of Columbia*, 413 F.3d

86, 102 (D.C. Cir. 2005) ("We have equated moving force with proximate cause.").  Put another

way, municipal liability under section 1983 requires both (1) a predicate constitutional violation

and (2) that a policy or custom of the municipality caused that constitutional violation.  *Monell*,

436 U.S. at 694; *accord Harvey*, 798 F.3d at 1049 ("To sustain a claim against a municipality

under § 1983, a plaintiff must show that the policy or custom of the municipality caused a

violation of the plaintiff's constitutional rights.").  "[A] municipality cannot be held liable under

§ 1983 on a respondeat superior theory."  *Monell*, 436 U.S. at 691.  "There are four basic

categories through which [a plaintiff] may establish municipal liability against the District: (1)

express municipal policy; (2) adoption by municipal policymakers; (3) custom or usage; and (4)

deliberate indifference."  *Singh v. District of Columbia*, 55 F. Supp. 3d 55, 75 (D.D.C. 2014).

### 3.  Qualified Immunity

Qualified "immunity protects all but the plainly incompetent or those who knowingly

violate the law."  *White v. Pauly*, 137 S. Ct. 548, 551 (2017) (internal quotation marks omitted).

It accomplishes this by "shield[ing] federal and state officials from money damages unless a

plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and

(2) that the right was 'clearly established' at the time of the challenged conduct."  *Ashcroft v. al-

Kidd*, 563 U.S. 731, 735 (2011) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  "It is

[the plaintiff's] burden to show that the particular right in question—narrowly described to fit the

factual pattern confronting the [officials]—was clearly established."  *Dukore v. District of

Columbia*, 799 F.3d 1137, 1145 (D.C. Cir. 2015); *see also Kyle v. Bedlion*, 177 F. Supp. 3d 380,

388 (D.D.C. 2016) ("A defendant bears the burden of raising the defense of qualified immunity in response to a claim brought under section 1983, and once the defense is asserted, 'the burden of proof then falls to the plaintiff to show that the official is not entitled to qualified immunity.'" (cleaned up) (quoting *Winder v. Erste*, 905 F. Supp. 2d 19, 28 (D.D.C. 2012))).

Judges may "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009); *Jones v. Kirchner*, 835 F.3d 74, 86 (D.C. Cir. 2016). It is "often beneficial" to consider the violation prong first and the "clearly established" prong second, especially when "there would be little if any conservation of judicial resources to be had by beginning and ending with" the "clearly established" prong. *Pearson*, 555 U.S. at 236. But in cases where "it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right," it may be a better use of "scarce judicial resources" to begin with the "clearly established" prong. *Id.* at 236–37.

For a constitutional right to be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). This requires "existing precedent" to "have placed the statutory or constitutional question beyond debate," although it is not necessary to have "a case directly on point." *al-Kidd*, 563 U.S. at 741. If there is no controlling authority, then there must be "a robust 'consensus of cases of persuasive authority.'" *Id.* at 742 (quoting *Wilson v. Layne*, 526 U.S. 603, 617 (1999)). The Supreme Court has cautioned lower courts "not to define clearly established law at a high level of generality," such as arguing "that an unreasonable search or seizure violates the Fourth Amendment," because that "is of little help in determining whether the violative nature of particular conduct is clearly established." *Id.*

Although, as discussed above, the Court applies the professional-judgment standard to Griffin's claims, the deliberate-indifference standard must be used to analyze the "clearly established" prong of qualified immunity.  In this case, qualified immunity is raised as a defense to alleged violations of Griffin's substantive-due-process right to adequate medical care.  As explained above, there is no controlling precedent in this circuit deciding whether the professional-judgment or deliberate-indifference standard applies to patients like Griffin.  Therefore, for Griffin's right to have been clearly established at the time of alleged violation regarding specific conduct, it must have been clearly established that the conduct in question met the deliberate-indifference standard because that standard is arguably more permissive.  If the standard itself was not clearly established—which it could not be if there is not even a circuit case on point for this purely legal question—then it could not have been clearly established at the time that any failure of professional judgment constituted a Fifth Amendment violation, even though the Court today holds that the professional-judgment standard is in fact applicable.  By the same logic, because the deliberate-indifference standard is no more strict than the professional-judgment standard, it was at least clearly established that deliberate-indifference violations would violate Griffin's rights; no party suggests that a standard more permissive than deliberate indifference applies, such as "a purpose to cause harm," *Sacramento*, 523 U.S. at 836, and the Court sees no reason that a more-permissive standard would apply.

That said, it is debatable whether the deliberate-indifference standard is in fact more permissive than the professional-judgment standard.  *Jordan*, 161 F. Supp. 3d at 57.  Therefore, the choice of standard here is unlikely to have an impact on the ultimate questions of qualified immunity.

## B.  Municipal Liability

The District moves for partial summary judgment on two grounds.  First, the District argues that Plaintiff has not pleaded a 1983 claim against the District for Griffin's death, as opposed to other injuries.  Second, the District argues that no facts connect Griffin's death to a District custom, policy, or practice.  For the reasons given below, the District's motion is denied.[11]

### 1.  Plaintiff Adequately Pleads a 1983 Claim Against the District for Griffin's Death

The District's first argument for summary judgment is that the *Monell* (i.e., municipal liability) claim against the District in Plaintiff's complaint does not cover Griffin's death.  *See* D.C. Mem. at 6–8.  As explained below, the Court holds that Plaintiff has adequately pleaded a 1983 claim against the District that includes Griffin's death.

According to the District, there is no factual basis in the complaint connecting Griffin's death to a lack of payment protocol for specialty outpatient care.  D.C. Mem. at 6.  Griffin

---

[11] The District does not argue that the municipal 1983 claim must fail if the 1983 claims against all the individual Defendants fail.  The law does not appear to require that result in all circumstances, but the Court will not opine on this issue without hearing from the parties.  *See, e.g.*, *Hunter v. District of Columbia*, 824 F. Supp. 2d 125, 132 (D.D.C. 2011) (explaining that individual officers need not be named "at all[] in order for municipal liability to attach" as long as "the underlying constitutional violation" is proven); *see also, e.g.*, *Glisson v. Indiana Dep't of Corr.*, 849 F.3d 372, 378 (7th Cir. 2017) (en banc) ("[A]n organization might be liable even if its individual agents are not."); *Fairley v. Luman*, 281 F.3d 913, 917 (9th Cir. 2002) ("If a plaintiff establishes he suffered a constitutional injury *by the City*, the fact that individual officers are exonerated is immaterial to liability under § 1983."); *id.* ("These alleged constitutional deprivations were not suffered as a result of actions of the individual officers, but as a result of the collective inaction of the Long Beach Police Department."); *Barrett v. Orange Cnty. Hum. Rts. Comm'n*, 194 F.3d 341, 350 (2d Cir. 1999) ("We agree with our sister circuits that under *Monell* municipal liability for constitutional injuries may be found to exist even in the absence of individual liability, at least so long as the injuries complained of are not solely attributable to the actions of named individual defendants.").

ultimately died from a disputed cardiac issue, yet the 1983 claim concerns Griffin's knee and foot conditions. *Id.* at 7; *see* D.C. Reply at 2 ("Plaintiff did plead a *Monell* claim for missed outpatient medical appointment payment mechanism for Griffin's knee and foot."). Although Count IV incorporates by reference earlier paragraphs referring to Griffin's death, including references to failure to diagnose bradycardia and failure to provide timely resuscitation, the District argues that this "boilerplate" incorporation does not explain the scope of the 1983 theory Plaintiff pursues against the District for Griffin's death. D.C. Mem. at 7. And that lack of explanation means that "Plaintiff did not put the District on notice of a § 1983 claim arising from Griffin's death." *Id.* at 7–8. The theory that Plaintiff now pursues—that failure to treat Griffin's foot and knee issues led to overprescription of Motrin, which then led to Griffin's heart failure and death—was not spelled out in the complaint. D.C. Reply at 1. The District also notes that *respondeat superior* is not applicable to 1983 claims, so Plaintiff must show how the District itself violated Griffin's rights. D.C. Mem. at 8.[12]

Plaintiff argues that death is merely another damage, such as pain and suffering from delayed foot and knee treatment, caused by the District's payment custom. Pl.'s D.C. Opp'n at 1. Accordingly, a jury should make the fact-dependent determination of whether the District's payment custom proximately caused Griffin's death. *Id.* at 2. Plaintiff argues that it is unnecessary to plead damages with particularity because "discovery will shed light on the nature of the damages." *Id.* at 5 (quoting *Democracy Partners v. Project Veritas Action Fund*, 285 F. Supp. 3d 109, 126 (D.D.C. 2018)).

---

[12] The parties also discuss whether this issue should have been raised earlier as a motion to dismiss and whether the District previously admitted certain *respondeat superior* liability. *See* Pl.'s D.C. Opp'n at 4; D.C. Reply at 2–3. Because the Court rules against the District's motion and resolution of these issues could only help Plaintiff, there is no need to resolve them.

Plaintiff also argues that the complaint did put the District on notice that the *Monell* claim covered Griffin's death.  Paragraph 47 of the complaint references "[t]he actions and *policies* of these Defendants" that violated Griffin's Fifth-Amendment rights "by preventing the administration of necessary medical and nursing care and causing Griffin's *death*."  *Id.* at 6 (emphases added).  Plaintiff notes that only the District could have a policy.  *Id.*

Although the complaint does not contain much factual detail, it provides the District notice that Plaintiff pursues a 1983 claim that encompasses Griffin's death.  Federal Rule of Civil Procedure 8 requires only "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  "[T]he pleadings must 'give the defendants fair notice of what the claim is and the grounds upon which it rests,' but the Rule 'does not require detailed factual allegations.'"  *Jones v. Kirchner*, 835 F.3d 74, 79 (D.C. Cir. 2016) (cleaned up) (quoting *Twombly*, 550 U.S. at 555; and *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  And a complaint "must be construed so as to do justice."  Fed. R. Civ. P. 8(e).

Given the allegations in this case, which concern the medical care provided to a single plaintiff who died while involuntarily committed in the District's custody, the District cannot reasonably be surprised that Plaintiff intended to include Griffin's death in all of its claims, despite admittedly sparse factual pleading.  In a paragraph within the "Facts" section of the complaint—not specifically related to one count—Plaintiff alleges: "As a consequence of Defendants' failure to provide appropriate medical intervention, Mr. Griffin's condition worsened over the following months and he died on January 31, 2012."  Compl. ¶ 21.  Within the section of the complaint specifically for the 1983 claim, Plaintiff alleges that the "actions and policies of these Defendants . . . violated the constitutional rights of Griffin under the Fifth Amendment by preventing the administration of necessary medical and nursing care *and causing*

*Griffin's death*."  Compl. ¶ 47 (emphasis added).  Plaintiff does not explicitly spell out the

Motrin-overprescription theory, but alleging that Griffin was not given necessary medical care

due to a District policy regarding payment to outside medical providers and that he subsequently

died is enough to have put the District on notice that Plaintiff was seeking recovery for Griffin's

death in the *Monell* claim.  *See Richardson v. District of Columbia*, 322 F. Supp. 3d 175, 187

(D.D.C. 2018) ("'If a complaint alleging municipal liability under § 1983 may be read in a way

that can support a claim for relief, thereby giving the defendant fair notice of the claim, that is

sufficient' to survive dismissal." (quoting *Baker v. District of Columbia*, 326 F.3d 1302, 1307

(D.C. Cir. 2003))).

    In the abstract, the District's argument that it could not move to dismiss a claim that it did

not know existed is reasonable.  *See* D.C. Reply at 2 ("[T]he District could not move to dismiss a

claim that was not pleaded").  But here, where the District knew at the time of the complaint's

filing that Griffin had died while in Saint Elizabeths' custody, it is far less persuasive.  The

complaint put the District on notice that Griffin's death was part of the allegations.  Even if the

complaint did not so clearly refer to Griffin's death, the fact that the complaint was filed two

years after Griffin's death and contains allegations of insufficient medical care provided

sufficient notice.  Additionally, in a status conference on August 16, 2017, in response to

Defendants' counsel stating that "what killed Mr. Griffin . . . was not related to anything

involving the payment mechanism" and that "[t]he policy, practice, and custom piece of the case

involves this broken foot that had nothing to do with his death," the Court responded, "I

understand that that's in controversy," and Plaintiff's counsel confirmed that Plaintiff did not

agree with Defendants on this point.  Status Conf. Tr. 12:1–14 (Aug. 16, 2017), ECF No. 113.

After that status conference, and more than three years before the District filed this motion, the

Court twice stated in the first sentence of opinions that "Plaintiff . . . filed this action against *the District of Columbia* and several other defendants . . . *based on the death* of Reuel Griffin." *Raynor v. District of Columbia*, 296 F. Supp. 3d 66, 68 (D.D.C. 2017) (emphases added) (citing the complaint); *accord Raynor v. District of Columbia*, No. 14-cv-0750, 2018 WL 852366, at *1 (D.D.C. Feb. 12, 2018).  All of this constitutes further notice that Plaintiff and the Court understood the complaint's *Monell* claim to encompass Griffin's death, with no actions by the District taken to the contrary for several years.

 The District cites cases stating that a plaintiff cannot pursue a legal theory not found in the complaint, or otherwise cure pleading defects via summary-judgment briefing.  *See* D.C. Reply at 2–3.  This is true, but the facts of those cases more clearly constitute attempts to rely on theories not contained in the complaint.  In *Navajo Nation v. U.S. Forest Service*, 535 F.3d 1058 (9th Cir. 2008) (en banc), the court held that the plaintiffs "failed sufficiently to present this NEPA claim to the district court" when the plaintiffs "d[id] not explain why their complaint is . . . sufficient to state" the claim in question, conceded that "the specific allegations at issue were not included" in the complaint, and argued explicitly that the claim "was adequately presented to the district court" because it was briefed at summary judgment.  *Id.* at 1079–80.  In *Trudel v. SunTrust Bank*, 924 F.3d 1281 (D.C. Cir. 2019), the plaintiff tried to use fundamentally different facts under an already-pleaded claim for relief.  *See id.* at 1286 ("[T]he theory that plaintiffs sought to pursue (concealment of an unclaimed account in the early 2000s) reflected a 'fundamental change' from the theory that they pleaded (concealment of contractor relationships during litigation, almost 15 years later).").  In *SEC v. Brown*, 878 F. Supp. 2d 109 (D.D.C. 2012), the Securities and Exchange Commission argued in summary-judgment briefing that a statute of limitations should be tolled based on when the SEC discovered, or should have discovered

through due diligence, that it was injured.  *Id.* at 120.  But the complaint did not allege when the SEC discovered the injury or that the SEC was unaware of the relevant conduct until within the tolled limitations period.  *Id.*  Here, in contrast, the District was on notice that Plaintiff was pursuing claims relating to Griffin's death due to failure to provide appropriate medical care. Plaintiff's failure to specifically plead the theory that overuse of Motrin led to Griffin's death is not fatal to Plaintiff's claim.  Unlike the cited cases, Plaintiff's theory is well within the contours of the complaint.  The complaint could have been more detailed, but Plaintiff does not seek to rely on wholly different arguments as the plaintiffs did in the cited cases.

2.  Sufficient Evidence Connects Griffin's Death to a District Custom, Policy, or Practice

The District's second argument for summary judgment is that there are not sufficient facts to connect Griffin's death to a District custom, policy, or practice.  *See* D.C. Mem. at 9–16. As explained below, the Court holds that Defendants have not shown that there is insufficient evidence from which a reasonable jury could find that a District custom, policy, or practice caused Griffin's death for purposes of municipal liability.

This argument concerns the requirement for 1983 liability specific to municipalities that, beyond showing a constitutional violation, a plaintiff must show that the municipality was the "moving force" behind the violation, i.e., that a municipal custom, policy, or practice caused the constitutional violation.  *Monell*, 436 U.S. at 694; *accord Harvey*, 798 F.3d at 1049.  This ensures that the municipality itself caused the violation, as opposed to merely that, for example, a District employee caused the violation.  The District focuses in its motion not on whether a municipal custom, policy, or practice existed, but whether one caused Griffin's death.  In other words, the issue is whether such a custom, policy, or practice was the moving force behind the

alleged violation. "We have equated moving force with proximate cause," which includes elements of cause in fact and foreseeability. *Smith*, 413 F.3d at 102.

The District argues that no expert testimony or medical documentation connects Griffin's death to his knee and foot issues or Saint Elizabeths' payment practices. D.C. Mem. at 9. For example, Plaintiff's orthopedic surgeon expert testified that Griffin's death was not related to his knees or foot, and Plaintiff's nursing care experts "do not link" the knee and foot care to Griffin's death. *Id.* The District points to other opinions of Plaintiff's experts that also do not directly connect Griffin's death with his knee and foot issues or the outpatient appointments that Plaintiff alleges were not carried out due to Saint Elizabeths' payment practices. *See, e.g.*, D.C. Mem. at 10 ("Dr. Schwartz identifies no appointments that any Saint Elizabeths doctor recommended, referred, or ordered that were missed and would have prevented Griffin's cardiac arrest."). Similarly, "Griffin's missed outpatient medical [appointments] were not related to his cardiac care." *Id.* at 12. Griffin's medical records show care provided by Saint Elizabeths and referrals to outside medical providers related to his knees and foot, but none related to cardiac care. *See id.* at 12–15. Because Griffin died from cardiac issues and none of this performed or unperformed medical care related to Griffin's cardiac health, the District argues that no facts demonstrate causality between Griffin's death and the District's alleged custom, policy, or practice relating to payment for outside medical care. *See id.* at 16.

Regarding Plaintiff's theory that the delayed knee and foot care led to overprescription of Motrin, which then led to cardiac problems, the District argues that "Plaintiff has no evidence or expert testimony that supports her claim that Griffin received more Motrin because he missed outpatient medical appointments, or that Griffin would have received fewer Motrin had the outpatient appointments been kept," or that being prescribed less Motrin would have avoided

Griffin's heart failure.  D.C. Reply at 5.  According to the District, such a complex medical theory must be supported by expert medical testimony.  *Id.*

      Plaintiff argues that there is sufficient evidence that the District's custom of not having a viable payment method for outpatient appointments caused Griffin's death.  *See* Pl.'s D.C. Opp'n at 7–11.  As acknowledged by the District, Plaintiff's cardiology expert opined that Griffin was overprescribed Motrin.  *Id.* at 7.  But the District does not acknowledge that Plaintiff's cardiology expert also opined that the overprescription of Motrin was a cause of Griffin's cardiovascular disease that led to his death.  *Id.*  The District also ignores the opinion of another of Plaintiff's experts that it was below the standard of care to treat Griffin's foot and knee issues with only pain medication, and that these large doses of Motrin contributed to Griffin's cardiovascular condition.  *Id.* at 7–8.  Plaintiff argues, without citation, that "[t]he excessive prescription of Motrin only occurred because Defendant's Custom resulted in untreated painful orthopedic conditions."  *Id.* at 7.  Plaintiff also advances a second, related theory of municipal causation of Griffin's death: failure to treat Griffin's foot and knee conditions led to overprescribing Motrin, which created the need for pain assessments, which Saint Elizabeths nurses failed to perform, and which would have revealed signs of congestive heart failure.  *Id.* at 9.

      There is sufficient evidence from which a reasonable jury could find that the District's alleged custom of having no way to pay for external medical care was the moving force of Griffin's death.  When Plaintiff's experts opine that Griffin's death was not from an orthopedic problem, those opinions do not necessarily exclude Plaintiff's theory that Griffin died from excessive medication that was given due to an orthopedic problem.  Plaintiff has proffered expert testimony that Griffin was overprescribed Motrin and that the overprescription led to his death.

And there is evidence from which a reasonable jury could conclude that the excessive medication was given due to the failure to have Griffin receive external medical care for his knees and foot. A jury is capable of inferring, without expert testimony, that failure to treat painful injuries or conditions can result in additional prescription of pain medication.  It is not necessary for Plaintiff to have had an expert opine on each link in this chain of causation when some links can be inferred by the jury based on common sense.  *See Hudson v. Am. Fed. of Gov't Emps.*, No. 17-cv-2094, 2021 WL 5083436, at *8 (D.D.C. Nov. 2, 2021) ("While it may have been wise for Plaintiff to have other witnesses (perhaps including an expert) testify to his damages, 'it does not take an expert to confirm the jury's common sense with respect to both their existence and cause.'" (quoting *Daskalea v. District of Columbia*, 227 F.3d 433, 444 (D.C. Cir. 2000))); *Keys v. Washington Metro. Area Transit Auth.*, 577 F. Supp. 2d 283, 285 (D.D.C. 2008) ("Expert testimony is irrelevant if it . . . 'relates to matters of common sense' that a jury can decide for itself."); *cf. In re Davol, Inc./C.R. Bard, Inc., Polypropylene Hernia Mesh Prods. Liab. Litig.*, Nos. 2:18-md-2846, 2:18-cv-1320, 2021 WL 4931999, *6 (S.D. Ohio Oct. 22, 2021) ("[N]o expert need . . . supply every link in the chain of Plaintiff's theory of the case for his opinion to be relevant.").  It is also unclear what other evidence the District thinks Plaintiff would need to connect the alleged District policy to Griffin's death.  The District does not move for summary judgment on whether such a policy or custom existed.  It only moves for summary judgment on whether the complaint adequately pleaded the Motrin theory of municipal liability and whether Plaintiff has sufficient evidence to "link Griffin's death to his knee or foot outpatient care . . . [or] to his insurance issues or to the District's 'policy' or 'custom' regarding the 'IMD Exclusion.'"  D.C. Mem. at 9.  Although such expert testimony might have been useful on more targeted questions that require specialized knowledge and might carry more weight—such as

whether, based on Griffin's particular medical history, the unfulfilled external medical appointments would have led to treatment of Griffin such that less Motrin would have been prescribed—a lack of such specific expert testimony or record evidence is not fatal.  Plaintiff has expert testimony where it is needed.  The District is free to present evidence and argument that, even if Griffin had received outpatient care, Griffin would have died in the same way or been prescribed the same or similar amounts of Motrin.  But Plaintiff's claim does not fail for lack of evidence when a lay person can infer that failing to treat painful foot or knee problems can lead to higher use of pain medication.

### C.  Higher-Level-Employee Liability

Defendants move for summary judgment on Plaintiff's claims against four higher-level Saint Elizabeths employees: Canavan, Seymour, Arons, and Potter.  First, Defendants move for summary judgment on Plaintiff's 1983 claim (Count IV) against these Defendants, arguing that they are entitled to qualified immunity.  Second, Defendants move for summary judgment on Plaintiff's medical negligence claim (Count I), arguing that Plaintiff cannot prove that these Defendants breached a duty of care to Griffin.  For the reasons given below, Defendants' motion is granted regarding the 1983 claim and denied regarding the negligence claim.

#### 1.  The Higher-Level Employees Are Entitled to Qualified Immunity

Defendants' first argument for summary judgment regarding the higher-level employees is that they are entitled to qualified immunity.  Defs.' Higher-Level Mem. at 9.  Based on the facts of the alleged constitutional violation and the relevant law, the Court believes that, for these Defendants, "it is plain that a constitutional right is not clearly established."  *Pearson*, 555 U.S. at 237.  Accordingly, the qualified-immunity analysis for these Defendants begins and ends with the "clearly established" prong.  As explained above, Defendants' burden is merely to raise

qualified immunity as a defense; it is Plaintiff's burden to show that the rights at issue were clearly established. *Dukore*, 799 F.3d at 1145. Also as explained above, it was not clearly established that the professional-judgment standard applies to situations like Griffin's. Therefore, qualified immunity in this case requires showing that it was not clearly established that Defendants' conduct fails the deliberate-indifference test. "To establish a constitutional violation under that standard, [a plaintiff] must show that the District was deliberately indifferent to [the patient's] serious medical needs." *Harvey*, 798 F.3d at 1052. This can be shown when an official had "subjective knowledge of the patient's serious medical need and recklessly disregard[ed] the excessive risk to his health or safety from that risk." *Id.* (cleaned up) (quoting *Baker*, 326 F.3d at 1306).

The most important part of deciding whether a right has been clearly established is determining the appropriate level of generality for the right. Courts are instructed "not to define clearly established law at a high level of generality," such as arguing "that an unreasonable search or seizure violates the Fourth Amendment," because that "is of little help in determining whether the violative nature of particular conduct is clearly established." *al-Kidd*, 563 U.S. at 742. But the right should also not be defined such that it is limited to only the facts of this case.

Plaintiff proposes a right at too high a level of generality. Namely, Plaintiff argues that the right at issue is Griffin's "undisputed constitutional right to receive adequate medical care while committed" to Saint Elizabeths' custody. Pl.'s Higher-Level Opp'n at 9–10; *accord id.* at 11 ("The 'clearly established right' upon which Griffin's Complaint rests is his right to adequate medical care while committed to the custody of Saint Elizabeths Hospital."). Plaintiff is correct that this right exists and was clearly established, but wrong that this is the appropriate level of generality. "[T]he broad right" "to adequate medical care[] and to be free from deliberate

indifference to . . . serious medical needs" "cannot, without more, defeat qualified immunity." *Bernier v. Allen*, No. 16-cv-00828, 2019 WL 11320973, at *2 (D.D.C. Aug. 22, 2019); *accord Barkes v. First Corr. Med., Inc.*, 766 F.3d 307, 327 n.12 (3d Cir. 2014) (rejecting district court's characterization of the relevant right for qualified immunity as the "constitutional right to adequate medical care" because "this characterization fails to sufficiently particularize the asserted right"), *rev'd on other grounds sub. nom. Taylor v. Barkes*, 575 U.S. 822 (2015). Even if the Court agreed that this was the correct level of generality, Defendants' qualified-immunity defense would likely succeed for this right because knowing that there is a right to adequate medical care could not have put Defendants on notice that their particular conduct would violate that right. This knowledge would not have put the constitutionality of Defendants' conduct "beyond debate." *al-Kidd*, 563 U.S. at 741.

It is also critical to remember that these claims must be analyzed individually for each Defendant, not collectively. *See Iqbal*, 556 U.S. at 676 ("[A] plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."). Plaintiff must demonstrate that, for each Defendant, the relevant rights were clearly established such that the individual Defendant was on notice that their conduct would violate Griffin's Fifth-Amendment rights. For these analyses, it is irrelevant whether there was a clearly established right to overall care from Saint Elizabeths that was superior to the care Griffin received. The question for each Defendant is whether Griffin's rights were so clearly established that it was beyond debate whether that Defendant's conduct violated Griffin's rights.

It is difficult to define the appropriate right for each Defendant because, in response to Defendants' qualified-immunity arguments that largely differentiate between Canavan, Seymour, Arons, and Potter, Plaintiff offers a response that largely addresses them collectively. Plaintiff

does not focus on the specific responsibilities or actions of the four Defendants. Plaintiff argues

that the four Defendants "are being sued in their individual capacity in their roles as

administrators of the Hospital for their own personal involvement in failing to ensure that Griffin

received adequate medical care," and that they "were all either personally aware of Griffin's

denied medical appointments or aware that the Hospital was experiencing trouble with

scheduling external appointments for its patients as of Spring 2011." Pl.'s Higher-Level Opp'n

at 14. Because of their "high-level administrative positions," they were required to be

knowledgeable of the rules governing facilities like Saint Elizabeths, including regarding the

IMD exclusion. *Id.* Plaintiff argues that these Defendants failed to make the appropriate efforts

to ensure that patients could receive the appropriate outpatient care. *Id.* at 16. The only

differentiation among the Defendants is Plaintiff's argument that Canavan, Arons, and Seymour

"failed to exercise professional judgment in their administrative positions as articulated in

Plaintiff's Motion for Summary Judgment," and that Potter "failed to exercise professional

judgment when he failed to ensure that [Saint Elizabeths Hospital] staff adhered to professional

standards and practice and failed to ensure medical coverage for Griffin as required for someone

in his position." *Id.* at 16.

Based on this argument, the Court sees no reason that these particular Defendants could

have known that their conduct ran afoul of clearly established rights. Plaintiff cites no case law

beyond the most generic definitions of the right to adequate medical care. *See Perniciaro v. Lea*,

901 F.3d 241, 256 (5th Cir. 2018) (granting qualified immunity under professional-judgment

standard for mental-health facility's CEO, chief of staff, and treating physician where plaintiff

"has not cited a single case"—other than the professional-judgment standard itself—"clearly

establishing that the particular conduct at issue here violates the professional-judgment

standard"); *Marten v. Haire*, No. 6:17-cv-31, 2019 WL 1858504, at *6 (D. Mont. Apr. 25, 2019) ("Although *Youngberg* stands for the general proposition that the State has a duty to provide involuntarily committed mental patients with adequate medical care, it does not clearly establish what constitutes adequate medical care." (citation omitted)).  There is no reason to believe that there was binding case law or a robust collection of persuasive authority putting Defendants on notice, largely because there is almost no discussion of what specifically these Defendants should have done differently.

Out of an abundance of caution, the Court turns to Plaintiff's motion for partial summary judgment regarding these Defendants for any indication that the rights they are alleged to have violated might have been clearly established for purposes of qualified immunity.[13]  As explained below, the Court sees no such indication from Plaintiff's opening summary-judgment brief.

Plaintiff's argument that Canavan, the hospital CEO, violated Griffin's rights is essentially that, because Canavan is the ultimate policymaker for the hospital and allegedly had no knowledge of a protocol for payments for external care when he joined Saint Elizabeths, he should have ensured that an acceptable policy was in place to pay for external care and advised his subordinates to stop using Medicaid.  *See* Pl.'s Mem. at 24–25.  Taking these facts as true, the Court cannot imagine that there was clearly established law putting Canavan on notice that he was committing conscience-shocking behavior such that the unlawfulness of his actions was apparent, and Plaintiff has not cited any.  Defendants correctly respond that Plaintiff's allegations against Canavan are "highly generalized" and Plaintiff cites no case to demonstrate clearly established rights.  Defs.' Opp'n at 22.

---

[13] Plaintiff does not move for partial summary judgment regarding Potter.

Plaintiff's argument that Seymour, the hospital COO, violated Griffin's rights is similar. Seymour was responsible for Saint Elizabeths' day-to-day operations, was one of the people responsible for arranging payment for external services, and was aware of difficulties obtaining external medical care using Medicaid.  Pl.'s Mem. at 22–23.  Seymour became aware in the summer of 2011 that Griffin had been denied outpatient care on one occasion.  *Id.* at 23. "Quander-Clemons would typically contact her about denials by external medical providers."  *Id.* Plaintiff argues that Seymour is liable because she failed to ensure that Griffin "received recommended medical services and procedures by external providers" and failed to advise others to stop using Medicaid to schedule Griffin's appointments.  *Id.*  Again, the Court cannot imagine that Seymour was on clear notice that her conduct, as described by Plaintiff, would violate Griffin's Fifth-Amendment rights.  Plaintiff cites no case that would have provided sufficient notice.

Plaintiff's argument that Arons, the Director of the Office of Medical Affairs, violated Griffin's rights is essentially that he had a supervisory role regarding medical affairs, was aware of the IMD exclusion, and knew that Griffin had been denied outpatient care due to lack of insurance.  *Id.* at 25–26.  According to Plaintiff, the fact that Griffin did not receive the appropriate outpatient treatment for months shows that Arons failed to supervise the medical clinic personnel regarding using Medicaid and ensure that a functioning payment protocol was in place.  *Id.* at 26.  Once again, the Court cannot imagine that there was clearly established law putting Arons on notice that this conduct would violate Griffin's Fifth-Amendment rights, and Plaintiff cites no cases beyond the most general.

Therefore, the Court remains unconvinced that the relevant rights were clearly established.  For these claims, it is not enough for Plaintiff to proffer evidence from which a

32

reasonable jury could find that there was some negligence involved in Griffin's care, or that these Defendants specifically were negligent, or even that the aggregate care received by Griffin violated his Fifth-Amendment rights through conscience-shocking, deliberately indifferent conduct.  Instead, it is Plaintiff's burden to demonstrate for each individual Defendant that it was clearly established that *that Defendant's* conduct would sufficiently shock the conscience to constitute a Fifth-Amendment violation.  *See Est. of Williams by Rose v. Cline*, 902 F.3d 643, 651 (7th Cir. 2018) ("Our cases demonstrate a painstaking commitment to an individualized qualified-immunity analysis, especially when the facts relative to the alleged constitutional violation differ from defendant to defendant.").  Plaintiff makes no attempt to meet this burden. And this is a difficult burden for Plaintiff to meet for Defendants such as these whose connection to Griffin's treatment is attenuated and with responsibilities shared to various extents among many individuals.  *See Glisson v. Indiana Dep't of Corr.*, 849 F.3d 372, 375 (7th Cir. 2017) (en banc) (regarding deliberate indifference under the Eighth Amendment, describing as unlikely that the numerous medical providers who "had a hand" in providing care "personally did anything that would qualify as 'deliberate indifference'" because "[m]ost of them had so little to do with" the care provided); *id.* at 378 (explaining that, "[w]ithout the full picture, each person might think that her decisions were an appropriate response to a problem" and that "failure to situate the care within a broader context could be at worst negligent, or even grossly negligent, but not deliberately indifferent"); *see also Crowson v. Washington Cnty.*, 983 F.3d 1166, 1191 (10th Cir. 2020) (explaining that municipal policies that "devolve[] responsibility across multiple officers" may result in no individual officers committing constitutional violations yet be themselves unconstitutional "precisely because they fail to ensure that any single officer is positioned to prevent the constitutional violation").  Other types of liability may still apply in

these circumstances, but Plaintiff has not shown that each Defendant was on clear notice that their individual behavior would shock the conscience sufficiently to violate a patient's constitutional rights.  Defendants' motion for summary judgment on qualified immunity for these four Defendants is therefore granted.

   2.  Defendants Have Not Shown that Plaintiff Cannot Prove a Breach of Duty

   Defendants' second argument for summary judgment regarding the higher-level employees is that Plaintiff does not have the required expert testimony to prove a breach of duty.  *See* Defs.' Higher-Level Mem. at 33.  "[I]n any negligence action, '[t]he plaintiff must establish by competent evidence a standard of care; that the defendant violated that standard; and that such violation proximately caused injury to the plaintiff.'"  *District of Columbia v. Carmichael*, 577 A.2d 312, 314 (D.C. 1990) (second alteration in original) (quoting *Hughes v. District of Columbia*, 425 A.2d 1299, 1302 (D.C. 1981)).  Defendants' chief complaint is that neither Plaintiff's cardiac experts nor Plaintiff's "expert on the District's liability for an alleged policy failure," Andrew J. Phillips, mention Canavan, Seymour, Arons, or Potter specifically.  Defs.' Higher-Level Mem. at 33.  Accordingly, Defendants seem to argue that Plaintiff cannot prove duty or breach for these Defendants.  *See id.* at 34 (criticizing Phillips for failing "to state what duty [Defendants] had or how they violated any duty").  In support, Defendants cite cases for the proposition that "the 'intricacies' of operating a psychiatric hospital [are] far too complex for the average juror to understand without the assistance of competent expert testimony."  *Id.* at 34–35.  Defendants argue that there is no evidence concerning what those in Defendants' specific positions had authority to do, as opposed to responsibilities that lay elsewhere, such as those covered by DBH.  *See* Defs.' Higher-Level Reply at 3.  Regarding the standard of care put forth

by Plaintiff's expert, Defendants argue that it is based on internal policies which cannot establish standards of care.  *Id.* at 4.

Plaintiff responds that there is sufficient evidence of duty and breach.  Pl.'s Higher-Level Opp'n at 4–9.  For support, Plaintiff points to guidance from *Clark v. District of Columbia*, 708 A.2d 632 (D.C. 1997), one of the cases cited by Defendants: "[T]he expert must clearly relate the standard of care to the practices in fact generally followed by other comparable governmental facilities or to some standard nationally recognized by such units."  *Id.* at 635.  The *Clark* court also stated that "the plaintiff may, in certain circumstances and under specified conditions rely on a statute or regulation as proof of the applicable standard of care."  *Id.* at 636 (cleaned up). Plaintiff believes that her evidence meets these standards.  Phillips points to federal regulations that govern institutions such as Saint Elizabeths.  Pl.'s Higher-Level Opp'n at 5.  He opines that the regulations require an agreement with outside service providers for medical care that the institution cannot provide itself, and that medically necessary services must be provided.  *Id.* at 6.  Phillips testified that his opinions were based on his experience "and national standards derived from JCAHO and Medicare and Medicaid service standards."  *Id.* at 7.  When asked in his deposition who breached the standard of care, Phillips responded, "[s]enior staff," and named Canavan, Seymour, and Arons in particular.  *Id.*  Plaintiff also argues that Defendants' own depositions confirm that they were required to be familiar with the governing rules "and that their duties and responsibilities included ensuring the provision of medical care to [Saint Elizabeths Hospital] patients, including Griffin."  *Id.* at 8.

The Court will not grant Defendants' motion on this ground.  The thrust of Defendants' argument is that there is no expert testimony regarding each of Defendants' specific responsibilities and powers.  *See, e.g.*, Defs.' Higher-Level Reply at 3–4 ("The absence of

specific standard of care testimony applicable to each of these Defendants and the positions they held, or any actual record evidence creating any disputed issue of material fact about whether these Defendants even had authority to do anything about contracting or budgeting for outside medical care, is fatal to Plaintiff's negligence claim . . . .").  But Defendants do not dispute Phillips's core testimony regarding the standard of care, which is that "the institution must have an agreement with an outside source of these services to ensure that they are immediately available or a satisfactory agreement must be established for transferring patients to a general hospital that participates in the Medicare program."  Pl.'s Higher-Level Opp'n at 6.  The *Smith v. District of Columbia*, 306 F. Supp. 3d 223 (D.D.C. 2018), opinion, cited in Defendants' brief for the proposition that "[e]xpert testimony is required to explain the 'intricacies' of operating a psychiatric hospital, which is far too complex for the average juror to understand without the assistance of competent expert testimony," is a useful comparison.  Defs.' Higher-Level Mem. at 34–35.  The court there held that the plaintiff failed to prove the standard of care for the District regarding a certain aspect of operating a prison.  *Smith*, 306 F. Supp. 3d at 264.  The plaintiff's expert opined regarding the standard of care for federal prisons, but "failed to connect this evidence of what the federal government requires to what is done at the state and local pretrial facilities across the United States."  *Id.*  He also "provided no evidence from which one can conclude that the BOP protocol is in fact the national standard of care for jails."  *Id.*  Therefore, the issue in *Smith* was whether the expert's standard of care for federal prisons covered the pretrial jail facility in question.  Defendants do not raise the same challenge here by arguing that Phillips's testimony does not apply to Saint Elizabeths.  The other case cited by Defendants on this point, *Clark*, 708 A.2d 632, also does not explain what expert testimony is required to delineate responsibilities among higher-level officials.  The court there found that the expert's

testimony "amounted to no more than his personal opinion, or at best an unsupported assertion as to the national standard of care." *Id.* at 635.  Without any support for their theory that expert testimony is needed specifically targeting each Defendants' responsibilities, the Court will not grant Defendants' motion on this ground.

### D.  Lower-Level-Employee Liability

Defendants move for summary judgment on Plaintiff's 1983 claim (Count IV) against ten lower-level Saint Elizabeths employees: "Dr. Edger Potter, Dr. Peter Thura, Enyioma Anyatonwu, Daphne Jackson, Amma Pokuaah, Bernadette Williams, Florence Nwonye . . . , Toni Quander-Clemons, . . . Bernadeane Greene," and Arons.[14]  Defs.' Lower-Level Mem. at 1. Defendants argue that they are entitled to qualified immunity.  *Id.* at 20.  As opposed to the motion regarding higher-level employees, discussed above, the Court finds it appropriate to begin with the constitutional-violation prong of the qualified immunity test for these individuals, largely because Defendants focused less on the "clearly established" prong in this motion and there are more specific facts regarding each Defendant's conduct.  As explained above, the professional-judgment standard applies.  Under *Youngberg*, that standard is violated when there is "such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment."

---

[14] Plaintiff states that "Plaintiff is not pursuing 42 U.S.C. § 1983 Claims against Lisa DeLoatch or James Robinson."  Pl.'s Lower-Level Opp'n at 1.  Defendants' motion for summary judgment is therefore granted as to Plaintiff's 1983 claim against Defendants DeLoatch and Robinson.

Additionally, Defendants do not list Arons in their brief or proposed order as one of the Defendants moving for summary judgment.  *See* Defs.' Lower-Level Mem. at 1; Defs.' Lower-Level Proposed Order, ECF No. 282-2.  However, Arons was included in the ECF entry as one of the movants for this motion, the motion argues that "the Court should grant [Arons] qualified immunity," Defs.' Lower-Level Mem. at 27–28, and Plaintiff addresses Arons in response to the motion, *see* Pl.'s Lower-Level Opp'n at 17–18.  The Court therefore considers Arons to be a movant for this motion.

*Jordan*, 161 F. Supp. at 58 (quoting *Youngberg*, 457 U.S. at 323).  Also as explained above, it is critical to analyze these Defendants individually because there is no *respondeat superior* liability for 1983 claims.  Therefore, each individual Defendant's conduct, standing alone, must constitute a failure to exercise professional judgment that accordingly shocks the conscience. For the reasons given below, the Court grants Defendants' motion.

### 1.  Potter

During Griffin's time at Saint Elizabeths, Potter served as the Supervisory General Medical Officer.  Defs.' Lower-Level Mem. at 20.  Defendants acknowledge that Potter was one of several Saint Elizabeths employees that attended to Griffin's knee or foot during his time at the hospital.  *Id.* at 3.  However, Defendants describe Potter's encounters with Griffin as limited to a "consultive capacity."  *Id.* at 4.  According to Defendants, Potter treated Griffin on three occasions, although it is unclear which is the third.  *Id.* at 20.  Upon referral from Garcia, Potter assessed Griffin's knee on November 10, 2011, performing an arthrocentesis, collecting fluid, and injecting him with lidocaine and Kenalog.  *Id.* at 3–4.  Potter referred Griffin for a consultation about a potential knee replacement.  *Id.* at 4.  During a follow-up on January 10, 2012, Potter told Garcia that Griffin needed to be referred for a knee-replacement consult.  *Id.* Potter also directed that Griffin's 600mg of Motrin be a standing order with each meal, and increased Griffin's Tramadol.  *Id.*  Defendants argue that it was not Potter's responsibility to ensure the consult occurred.  *Id.* at 4–5.  Defendants note that none of Plaintiff's experts identified any instance where Potter deviated from his duty of care to Griffin.  *Id.* at 21.  By contrast, Defendants state that Potter's treatment "improved Griffin's condition."  *Id.* at 5.

In response, Plaintiff stresses that Potter's several interactions with Griffin made him aware of Griffin's serious conditions and the need for outside referrals.  Pl.'s Lower-Level Opp'n

at 8.  In his deposition, Potter agreed that his job description included the responsibility to "assure[] adequate medical care and treatment of the patients and inform[] superiors of any inadequacies of resources in the care and treatment of such patients." *Id.* at 8–9.  He also testified that "[g]iving appropriate and timely medical care" and "mak[ing] sure they have good outcomes" are the most important policies for doctors to follow.  *Id.* at 9.  Accordingly, Plaintiff contends that Potter had a responsibility to guarantee that Griffin received adequate and timely medical care, and that his failure to meet this duty precludes his claim for qualified immunity. *Id.* at 9–10.

Viewing the facts in the light most favorable to Plaintiff, no reasonable jury could find that Potter failed to exercise professional judgment.  It is undisputed that Potter checked on and cared for Griffin during his time at Saint Elizabeths.  There is no evidence that Potter ignored or disregarded Griffin's pain.  Instead, Potter treated Griffin and referred him for outside consults twice.  Plaintiff does not put forth any expert testimony about the need or urgency of obtaining the referrals.  *See Farabee v. Yaratha*, 801 F. App'x 97, 105 (4th Cir. 2020) (explaining that, absent evidence "that a decision not to offer a particular treatment was completely out of professional bounds, . . . a choice not to offer a certain treatment—like a choice not to order an X-ray—is a classic example of a matter for medical judgment" (internal quotation marks omitted)).  No reasonable jury could find that Potter's failure to personally ensure that certain referrals were carried out—despite Potter not being Griffin's primary physician—was a failure to exercise any professional judgment such that it shocks the conscience.

## 2. Thura

During Griffin's time at Saint Elizabeths, Thura was a General Medical Officer ("GMO")—a doctor providing day-to-day psychiatric and routine medical care.  Defs.' Lower-

Level Mem. at 21.  Thura treated Griffin twice.  In September 2011, Thura was asked by a nurse to assist Griffin with his pain.  *Id.* at 5.  Thura reviewed Griffin's medical history, including labs, and prescribed Motrin.  *Id.*  Around 7:00 a.m. on January 31, 2012, the day of Griffin's death, Anyatonwu called Thura to examine Griffin due to his complaints of leg pain.  *Id.*  Before seeing Griffin, Thura reviewed "all the information in the computer," such as Griffin's medication, medical problems, and physical exam reports.  *Id.* at 6.  From this, Thura learned about Griffin's arthritis, leg edema, hypertension, and ongoing medical history, including the outstanding consult for Griffin's legs.  *Id.*  Thura viewed edema on Griffin's knee and prescribed Motrin and a diuretic to address the edema fluid.  *Id.*  Before his shift ended at 8:00 a.m., "Thura emailed other doctors alerting them of Griffin's condition and the treatment that he provided."  *Id.*

Plaintiff responds that Thura's "glaring omissions" on January 31, 2012, "made the difference between life and death."  Pl.'s Lower-Level Opp'n at 10.  Thura failed to notice that Griffin had gained twelve pounds in ten days and one of Plaintiff's experts testified that 911 should have been called immediately because it was an emergency situation.  *Id.* at 10–11.  Plaintiff's expert pathologist opines that "[t]here was ample opportunity to recognize the signs" of congestive heart failure, including the significant accumulation of fluid, and that calling 911 earlier could have saved Griffin's life.  *Id.*

Viewing the facts in the light most favorable to Plaintiff, no reasonable jury could find that Thura failed to exercise professional judgment.  While Plaintiff argues that Thura "failed to take <u>any</u> action" to save Griffin, *id.* at 11, this is not true.  Both times that Thura treated Griffin, Thura reviewed Griffin's medical history, examined him, and prescribed treatment.  *See Youngberg*, 457 U.S. at 323 ("[T]he decision, if made by a professional, is presumptively valid; liability may be imposed only when the decision by the professional is such a substantial

departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." (footnote omitted)). Plaintiff's arguments address negligence, not professional judgment.  *See Jordan*, 161 F. Supp. 3d at 60 ("[T]he question whether . . . additional diagnostic techniques or forms of treatment is indicated is a classic example of a matter for medical judgment." (ellipsis in original) (quoting *Estelle v. Gamble*, 429 U.S. 97, 107 (1976))).  Thura did not ignore Griffin or take any action that would demonstrate a conscience-shocking failure to exercise professional judgment. Plaintiff cites evidence that Thura should have acted differently, but that alone is insufficient to show a failure of professional judgment.  *See, e.g.*, *Mitchell v. Washington*, 818 F.3d 436, 443–44 (9th Cir. 2016) (affirming summary judgment for doctors under professional-judgment standard where doctors did not prescribe certain treatment despite medical texts "suggesting that administration of [that treatment] is the preferred treatment course" because texts did not suggest that doctor's treatment decision, "based on the individualized circumstances of [plaintiff's] health, was unreasonable").  Plaintiff's evidence could, at most, support a finding of negligence. *See Harvey*, 798 F.3d at 1050 ("As the Supreme Court has frequently reminded us, the due process right 'does not transform every tort committed by a state actor into a constitutional violation.'" (quoting *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 202 (1989))).

### 3.  Anyatonwu

Anyatonwu was a charge nurse on Griffin's unit providing him with regular care during his time at Saint Elizabeths.  Defs.' Lower-Level Mem. at 22.  Defendants concede that Anyatonwu did not perform several pain assessments in January 2012.  *Id.* at 23.  However, Defendants argue that Anyatonwu engaged in other "ongoing efforts" to care for Griffin,

including his knee and foot issues. *Id.* "Anyatonwu regularly observed Griffin shadowboxing, standing up[,] and moving his feet." *Id.* at 6–7. Anyatonwu urged Griffin to stop because he could further injure himself. *Id.* at 7, 23. Griffin refused medication from Anyatonwu on at least four occasions, although Plaintiff disputes that fact. *Id.* at 7. On the day of Griffin's death, Anyatonwu noticed the edema on one of his legs and called Thura. *Id.* at 22. Per Thura's directions, Anyatonwu placed Griffin on sick call. *Id.* Defendants argue that, "[a]t most, Anyatonwu's failure to adequately document Griffin's care amounted to medical malpractice, not a constitutional violation." *Id.* at 23.

In opposition, Plaintiff argues that Defendants misrepresent the cited instances where Griffin allegedly refused medication from Anyatonwu. Pl.'s Lower-Level Opp'n at 11. Instead, Plaintiff highlights that part of Anyatonwu's job is to "administer prescribed medications and therapeutic measures." *Id.* at 12. As a result, Plaintiff says, even if Griffin refused or asked for different medication at any point, Anyatonwu still needed to administer it. *Id.* Plaintiff likewise disputes Defendants' contention that there is no evidence that Anyatonwu's failure to document Griffin's January 2012 pain assessments worsened Griffin's knee and foot problems. *Id.* Instead, Plaintiff explains that Anyatonwu's inaction "led to missing information and errors in Mr. Griffin's clinical record," which allowed Griffin's edema to go unnoticed until the day of his death. *Id.* Plaintiff states that if Nurse Anyatonwu had "done her job correctly and recorded complete and adequate pain assessments," Griffin's edema would have been noticed sooner, potentially saving his life. *Id.* at 12–13.

Taking the facts in the light most favorable to Plaintiff, no reasonable jury could find that Anyatonwu failed to exercise professional judgment in treating Griffin. There are several disputes regarding the importance and mandatory nature of documenting pain assessments in

certain ways, and there is evidence that Anyatonwu violated Saint Elizabeths nursing policies. But Defendants correctly argue that this was negligence at worst.  *See* Defs.' Lower-Level Reply at 23 ("At most, Anyatonwu's failure to adequately document Griffin's care amounted to medical malpractice, not a constitutional violation.").  Anyatonwu repeatedly treated Griffin, consistently interacting with him and cautioning him to refrain from shadowboxing for fear of worsening his condition.  *See Jordan*, 161 F. Supp. 3d at 60 ("[T]he question whether . . . additional diagnostic techniques or forms of treatment is indicated is a classic example of a matter for medical judgment." (ellipsis in original) (quoting *Estelle*, 429 U.S. at 107)).  Although Plaintiff has put forth evidence supporting a finding of negligence, the sum of evidence viewed most favorably toward Plaintiff could not support a finding that Anyatonwu failed to exercise professional judgment such that it shocked the conscience.  Plaintiff cites no expert opinion regarding Anyatonwu.  Additionally, even if Plaintiff had proffered sufficient evidence from which a reasonable jury could find that Anyatonwu failed to exercise professional judgment, Plaintiff has not put forth any argument that the rights violated were clearly established.

### 4.  Jackson

Jackson was the nurse manager for Griffin's unit.  Defs.' Lower-Level Mem. at 7. Defendants move for summary judgment regarding Jackson only concerning Jackson's conduct on January 31, 2012.  *See id.* at 24.  However, Plaintiff does not respond to this argument. Plaintiff instead argues that Jackson was "responsible for her failures as a Nursing Supervisor" to "confirm[]" that Anyatonwu and Nwonye were not copying and pasting entries in medical records and failing to conduct pain assessments.[15]  Pl.'s Lower-Level Opp'n at 13–14.  "A supervisor who merely fails to detect and prevent a subordinate's misconduct . . . cannot be

---

[15] Defendants assert that Jackson was only Anyatonwu's nurse manager, Defs.' Lower-Level Reply at 11 n.4, but this fact would not change the Court's decision.

liable for that misconduct.  The supervisor must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see." *Int'l Action Ctr. v. United States*, 365 F.3d 20, 28 (D.C. Cir. 2004) (cleaned up); *see also* Pl.'s Lower-Level Opp'n at 13 ("Nurse Jackson may be held liable if she 'had personal knowledge of and involvement in the alleged deprivation of [the plaintiff's] rights.'" (alteration in original) (quoting *Wright v. Collins*, 766 F.2d 841, 850 (4th Cir. 1985))).  Here, all Plaintiff points to is an alleged failure to detect and prevent misconduct of her subordinates, which cannot create supervisory liability under section 1983.  Additionally, the grant of qualified immunity to Anyatonwu and Nwonye weighs in favor of qualified immunity for Jackson.  *See Hegarty v. Somerset Cnty.*, 53 F.3d 1367, 1380 (1st Cir. 1995) ("The determination that a subordinate law enforcement officer is entitled to qualified immunity . . . increase[s] the weight of the burden plaintiff must bear in demonstrating not only a deficiency in supervision but also the essential causal connection or 'affirmative linkage' between any such deficiency in supervision and the alleged deprivation of rights.").

### 5. Nwonye

Nwonye was a nurse who provided care to Griffin.  Defs.' Lower-Level Mem. at 8. Nwonye testified that Griffin had refused to go to medical appointments, including an orthopedic clinic appoint.  *Id.*  Nwonye also explained that it took "a lot of . . . trials and encouragement" to get Griffin to go to an appointment for his foot.  *Id.*  Nwonye encouraged Griffin to walk with crutches and use them appropriately to avoid injury, and also to avoid bearing weight on his injured foot.  *Id.*  She testified that Griffin sometimes ignored her recommendations.  *Id.* "Plaintiff's nursing expert[] faults Nwonye for not advocating for Griffin to have an MRI and an orthopedic consult," but "[n]o binding case law would have put Nwonye on notice that she needed to advocate for these outside appointments lest she violate Griffin's constitutional

44

rights." *Id.* at 24.  Accordingly, Defendants argue that Nwonye did not fail to exercise professional judgment.

Plaintiff's arguments regarding Nwonye are similar to those for Anyatonwu.  Pl.'s Lower-Level Opp'n at 14.  Plaintiff argues that Nwonye is not shielded from liability "as the nurse responsible for administering [Griffin's] medication" simply because there were instances where Griffin refused it.  *Id.*  Plaintiff does not believe the record supports Nwonye's statements that Griffin refused or disliked his medication or treatment options.  *Id.*  Instead, Plaintiff posits that evidence of those events would be found in Nwonye's pain assessments.  *Id.*  Plaintiff indicates, however, that many of those were "incomplete or never conducted at all, similar to Nurse Anyatonwu's work."  *Id.*  Thus, because of Nwonye's failure to properly conduct pain assessments and ensure Griffin took all of his medication, Plaintiff emphasized that Nwonye cannot "be excused from [her] history of failing to properly care for" Griffin.  *Id.* at 15.

Viewing the facts in a light most favorable to Plaintiff, no reasonable jury could conclude Nwonye failed to exercise professional judgment in treating Griffin.  Plaintiff's nursing expert faulted Nwonye for not advocating for Griffin to have an MRI and an orthopedic consult.  Defs.' Lower-Level Mem. at 24.  And Nwonye did not complete pain assessment forms every time Plaintiff believes was necessary.  Pl.'s Lower-Level Opp'n at 14.  But, at worst, this was negligence or malpractice.  Plaintiff does not cite any expert opinions that would indicate that professional judgment was not exercised by Nwonye regarding failure to fill out pain assessment forms, as opposed to indicating that it may have been negligent.  Plaintiff does not cite any evidence that Nwonye ignored Griffin's pain, and undisputed facts show Nwonye following through on concerns about Griffin's health, such as by cautioning against bearing weight on his injured foot, documenting that she wanted Griffin to use his crutches appropriately, and

encouraging Griffin to keep his medical appointments. *See Jordan*, 161 F. Supp. 3d at 60

("[T]he question whether . . . additional diagnostic techniques or forms of treatment is indicated

is a classic example of a matter for medical judgment." (ellipsis in original) (quoting *Estelle*, 429

U.S. at 107)). It is undisputed that Nwonye had numerous interactions with Griffin and observed

his condition; there is no evidence that Nwonye knew of problems that required attention and

failed to exercise judgment about how to address them.

### 6. Pokuaah

Pokuaah was a nursing team leader assigned to Griffin's unit. Defs.' Lower-Level Mem.

at 8. Defendants argue that during Griffin's time at Saint Elizabeths, Pokuaah was not generally

responsible for administering his medication. *Id.* Pokuaah first observed Griffin's swollen foot

on March 3, 2011, and informed Griffin that he should elevate his feet while sitting or in bed. *Id.*

at 9. Though "Griffin often refused to care for his foot as instructed"; Pokuaah saw Griffin

shadowboxing despite his injured foot. *Id.* at 8–9.

Plaintiff responds by focusing on Pokuaah's "failures to conduct pain assessments" and

assigning responsibility to Pokuaah, as nursing team leader, for other nurses' failure to fill out

pain assessments. Pl.'s Lower-Level Opp'n at 15–16. Despite administering Motrin to Griffin

three times between March and May 2011, Pokuaah neither completed a pain assessment nor

contacted a physician about inadequate pain medication. *Id.* at 15.

Even viewing the facts in the light most favorable to Plaintiff, no reasonable jury could

conclude that Pokuaah failed to exercise professional judgment in treating Griffin. Pokuaah gave

Griffin Motrin only three times out of hundreds of Motrin administrations. Regarding her

supervision of other nurses, Plaintiff's only evidence is Pokuaah's general responsibilities of

"leading the other R.N.s at St. Elizabeths in proper caring for patients and documentation of

patient records" and ensuring that medications are "charted accurately." *Id.* at 16.  Plaintiff does not cite any evidence of what Pokuaah personally did or did not do in this capacity.  Essentially, Plaintiff seeks *respondeat superior* liability for other nurses' conduct.  Furthermore, as explained above, the other nurses are granted qualified immunity because a reasonable jury could not find that they failed to exercise professional judgment.  No reasonable jury could find that Pokuaah failed to exercise professional judgment based on the evidence proffered by Plaintiff.

### 7. Williams

Williams, a nurse, was one of several Saint Elizabeths employees that attended to Griffin's knee or foot during his time at the hospital.  Defs.' Lower-Level Mem. at 3. Defendants argue that Griffin was not one of Williams's assigned patients, so she had "little involvement" in caring for Griffin.  *Id.* at 9.  On the morning of Griffin's death, she documented the edema in his feet and immediately notified the nursing supervisor on duty.  *Id.* at 26. Defendants cite testimony from their expert that calling 911 at 8:46 a.m. as opposed to 9:07 a.m. "would not have saved Griffin's life."  Defs.' Lower-Level Reply at 16.

Plaintiff responds that Williams violated the professional judgment standard by failing to call 911 right after she examined Griffin and discovered that he was unable to move his legs. Pl.'s Lower-Level Opp'n at 16–17.  Plaintiff argues that Williams should have called 911 around 6:30 a.m., when she first reported that Griffin could not move his legs.  *Id.*  Plaintiff cites Arons's testimony describing Griffin's condition as "emergent, which requires an immediate emergency response."  *Id.* at 17.  Plaintiff likewise refers to Thura's statements indicating that a Code Blue should have been called at 8:46 a.m., when Williams noted a substantial decrease in Griffin's pulse.  *Id.*  Jackson ultimately called the code blue at 9:07 a.m.  *Id.*; Defs.' Lower-Level Mem. at 7.

Viewing the facts in the light most favorable to Plaintiff, no reasonable jury could find that Williams failed to exercise professional judgment.  Plaintiff cites her opening summary-judgment brief for the argument that 911 should have been called at 6:30 a.m., but the cited pages say nothing about 6:30 a.m.  They argue that a Code Blue should have been called at 8:46 a.m.  Pl.'s Mem. at 31–32.  And it is undisputed that after "Williams documented the edema in Griffin's feet on the morning of his death," she "immediately notified the nursing supervisor, Daphne Jackson."  Defs.' Lower-Level SUMF ¶ 23; Pl.'s Lower-Level SUMF Resp. ¶ 23; Defs.' Lower-Level Mem. at 9.  This undisputed fact was, on its face, an exercise of professional judgment.  Plaintiff cites testimony regarding whether the Code Blue or 911 should have been called at 8:46 a.m. as opposed to when it was ultimately called at 9:07 a.m., but this testimony does not address whether Williams exercised any professional judgment at all.  Plaintiff cites no evidence that deciding to notify Jackson was such an unreasonable decision that it essentially constitutes a failure to exercise any professional judgment, and that proposition is otherwise far from clear.  *See Jordan*, 161 F. Supp. 3d at 59 ("A mere disagreement about the scope of treatment or the proper diagnosis . . . is insufficient to shock the conscience and rise to the level of a constitutional due process violation.").  It may or may not have been negligent to delay the Code Blue call for about twenty minutes and instead notify Jackson, but it was not a failure to exercise professional judgment.  Therefore, Williams is entitled to qualified immunity.

### 8.  Arons

Arons was the hospital's Medical Affairs director, and never personally interacted with Griffin.  Defs.' Lower-Level Mem. at 10.  Defendants argue that Arons did not have direct responsibility for payments for outside appointments.  *Id.*  Arons testified that he believed outside appointments were being scheduled without issues, and that patients were being sent out

for appointments "constantly." *Id.* Arons was aware of only one instance in which Griffin was unable to receive outside medical care due to lack of insurance, and, as a psychiatrist, Arons was not suited to personally judge the urgency of needed outside appointments for Griffin's knee or foot. Defs.' Lower-Level Reply at 16–17.

Plaintiff argues that Arons cannot receive qualified immunity because of the supervisory duties inherent in his job as Saint Elizabeths' Medical Affairs Director. Pl.'s Lower-Level Opp'n at 17. Plaintiff explains that a supervisory official may be liable "where it is affirmatively shown that the official charged acted personally in the deprivation of the plaintiff's rights." *Id.* (quoting *Vinnedge v. Gibbs*, 550 F.2d 926, 928 (4th Cir. 1977)). Plaintiff also says that Arons should be held liable if he, in his supervisory role, is aware of and approves, condones, or turns a blind eye to conduct depriving a victim of their rights. *Id.* (citing *Matthews v. City of E. St. Louis*, 675 F.3d 703, 708 (7th Cir. 2012)). According to Plaintiff, Arons's job description outlined his duty to manage, direct, supervise, and oversee all phases of the facility's medical affairs. *Id.* at 18. Plaintiff argues that Arons was the hospital's "senior ranking physician," so it was his responsibility for ensuring other doctors adhered to medical and psychiatric standards for patient care and treatment. *Id.* She further argues that Arons is ineligible for qualified immunity because his subordinate doctors did not provide Griffin with an acceptable quality of care and treatment. *Id.*

Even viewing the facts in the light most favorable to Plaintiff, no reasonable jury could find that Arons failed to exercise professional judgment. Plaintiff argues for only supervisory liability, and such liability, according to Plaintiff, requires showing that the individual acted personally in the deprivation of rights, such as by approving of activity or turning a blind eye. Yet Plaintiff does not cite a single piece of evidence regarding Arons's personal contribution to

allegedly violating Griffin's rights.  *See* Pl.'s Lower-Level Opp'n at 17–18 (citing only cases and evidence regarding Arons's job descriptions).  Therefore, no reasonable jury could find that Arons failed to exercise professional judgment in his supervisory capacity.

### 9.  Quander-Clemons

During Griffin's time at Saint Elizabeths, Quander-Clemons was responsible for scheduling outside appointments.  Defs.' Lower-Level Mem. at 10.  She used Medicaid to pay for patients with Medicaid coverage until she "received a letter stating that Medicaid could not be responsible" for those individuals' bills.  *Id.*  Quander-Clemons would schedule an appointment after receiving a consult form from a doctor regardless of whether the patient had insurance.  *Id.* at 11.  Upon learning an individual had been turned away from outside care because of a lack of insurance, Quander-Clemons would alert the referring doctor.  *Id.* at 28.  She informed Arons, Smith, and hospital administration about Griffin's scheduling issues.  *Id.* at 11–12.

Plaintiff agrees that Quander-Clemons would receive consults from doctors, schedule appointments independent of a patient's insurance status, and use an individual's Medicaid number when scheduling.  Pl.'s Lower-Level Opp'n at 18.  However, Plaintiff argues that "Quander-Clemons' continued use of Medicaid even after the denials began happening demonstrates a failure to exercise professional judgment."  *Id.* at 19.

The parties appear to dispute whether Quander-Clemons continued using Medicaid numbers to schedule appointments after she received a letter stating that Medicaid could not be used for certain patients.  *See* Defs.' Lower-Level Reply at 17.  But this is irrelevant.  Viewing the facts in the light most favorable to Plaintiff, no reasonable jury could find Quander-Clemons failed to exercise professional judgment in this case.  The undisputed facts show that she did

exercise professional judgment by alerting the requesting doctors and Saint Elizabeths administrators when outpatient appointments could not be scheduled.  Plaintiff does not proffer any evidence suggesting that this was not an exercise of professional judgment or that Quander-Clemons would not otherwise be entitled to qualified immunity even if such evidence were proffered.

### 10.  Greene

Greene was Quander-Clemons's assistant during the relevant time period.  Defs.' Lower-Level Mem. at 12.  She is entitled to qualified immunity for the same reason as Quander-Clemons.  Plaintiff does not dispute that Greene would alert the doctor, nurse, and social worker of the patient's unit if there was a failure to schedule an appointment, *id.* at 13, and this constitutes an exercise of professional judgment.  Even if there were evidence that Greene did not exercise professional judgment, Plaintiff has not shown that Greene is not otherwise entitled to qualified immunity.

### E.  Plaintiff's Motion for Partial Summary Judgment

Plaintiff moves for partial summary judgment on liability for the 1983 and negligence claims.  Many parts of Plaintiff's motion for partial summary judgment are resolved by the Court's decisions above relating to Defendants' motions.  Specifically, Plaintiff's requests for summary judgment on liability for certain individual Defendants—Canavan, Seymour, Arons, Quander-Clemons, Anyatonwu, Pokuaah, Nwonye, and Williams—are denied due to grants of qualified immunity.  The remaining portion of Plaintiff's motion concerns 1983 and negligence liability for the District and negligence liability for two groups of individual Defendants:

officials and administrators, and medical personnel.  For the reasons given below, the Court

denies the remainder of Plaintiff's motion.[16]

### 1.  District 1983 Liability

Plaintiff moves for summary judgment on the District's 1983 liability for violation of

Griffin's Fifth-Amendment right to adequate medical care.  As explained above, municipal

liability under section 1983 requires both a predicate constitutional violation and that the

municipality was the "moving force" of the violation.  *Moreno*, 925 F. Supp. 2d at 99; *see also*

*Monell*, 436 U.S. at 694; *Harvey*, 798 F.3d at 1049.  Plaintiff first argues that a predicate

constitutional violation occurred, then argues three theories of causation necessary for municipal

liability under section 1983.  For the reasons given below, Plaintiff has not demonstrated that no

genuine disputes of material fact prevent judgment for Plaintiff as a matter of law.

### a.  Predicate Constitutional Violation

The predicate constitutional violation advocated by Plaintiff is as follows: all relevant

District employees acted under color of state law; Griffin was involuntarily committed to Saint

Elizabeths; because Griffin was involuntarily committed, he had a substantive-due-process right

under the Fifth Amendment to adequate and necessary medical care; Griffin did not receive all

adequate and necessary medical care because outside medical appointments recommended by his

Saint Elizabeths doctors for his knees and foot were not completed; and the failure to carry out

these outside appointments shocks the conscience such that Griffin's Fifth-Amendment rights

were violated.  *See* Pl.'s Mem. at 4–14.  Defendants do not respond directly to these arguments

on the predicate constitutional violation in their brief.  Instead, they oppose only the municipal-

---

[16] Because the Court denies Plaintiff's motion, it is unnecessary to address Defendants'
arguments regarding Plaintiff's Statement of Undisputed Material Facts.  *See* Defs.' Opp'n at
51–52.

causation element, discussed below.  But even without opposing arguments on point, it is the

Court's duty to grant summary judgment only when convinced that there are no genuine disputes

of material in fact such that the movant is entitled to judgment as a matter of law.  *See* Fed. R.

Civ. P. 56(a); *Winston & Strawn, LLP*, 843 F.3d at 505.

      The first three links in Plaintiff's argument are uncontroversial.  Defendants have never

indicated in any of their papers that the relevant personnel were not acting under color of District

of Columbia law.  Defendants do not dispute that Saint Elizabeths "is the public psychiatric

hospital for the District of Columbia," Defs.' SUMF Resp. ¶ 1, and never contest the

foundational fact of this case that Griffin was involuntarily committed, *cf.* Pl.'s Mem. at 1

("Reuel Griffin was an adult with mental illness who was involuntarily committed to Saint

Elizabeths Hospital after being found Not Guilty By Reason of Insanity in 1983.").  The scope of

constitutional rights afforded to Griffin due to his involuntary commitment is a legal conclusion.

As explained above, the Court holds that NGBRI individuals involuntarily committed to

psychiatric institutions are entitled to necessary and adequate medical care under the

professional-judgment standard.  *See Harvey*, 798 F.3d at 1050 (explaining that, under

*Youngberg*, the State has an "affirmative duty . . . to provide necessary medical care"); *id.* at

1051 (referring to "the District's duty under *Youngberg* to ensure [that the involuntarily

committed plaintiff] received adequate medical care"); *see also Youngberg*, 457 U.S. at 324

(stating that "the essentials of the care that the State must provide" include "adequate . . . medical

care").

      Next is Plaintiff's contention that Griffin did not receive all adequate and necessary

medical care "when he was not provided with recommended treatment for his knee and foot."

Pl.'s Mem. at 8 (cleaned up).  Plaintiff's entire argument on this point comes from two

paragraphs in her brief.  The first paragraph addresses only the professional-judgment standard, which is not relevant to determining the factual question of whether all adequate and necessary medical care was provided.  The second paragraph argues that the District has conceded that there were delays in scheduling or completing treatment for Griffin from outside medical providers, and that the District does not dispute "that none of Griffin's referrals to outside care for his foot fracture and knees were fulfilled."  *Id.*  Plaintiff also asserts that it is "undisputed that . . . as of January 11, 2012, [Griffin] needed total knee replacement surgery."  *Id.*  Plaintiff points to testimony of Canavan and another Saint Elizabeths doctor to show that "there were delays in Mr. Griffin's medical care."  *Id.*  Last, Plaintiff argues that it is Saint Elizabeths' "goal" to accomplish "recommended medical procedures . . . in a timely manner 'as determined by the physicians managing the care.'"  *Id.* at 9.  Plaintiff cites paragraphs eight and fifty-one through sixty-nine of its Statement of Undisputed Material Facts in support.

This short argument does not remove doubt that there are genuine disputes of material fact.  Whether Griffin received all adequate and necessary medical care is a fact-intensive question, and although expert testimony may not be required to support a finding in Plaintiff's favor, it would be difficult for the Court to conclude that there are no genuine disputes of material fact on this question without hearing from an expert.  The Court has reviewed the cited paragraphs of Plaintiff's Statement of Undisputed Material facts and Defendants' responses to the same.  They do not make it clear that it is undisputed that Griffin was not provided all adequate and necessary medical care.  Plaintiff's proposed undisputed facts regarding generally providing recommended external medical care to patients do not directly address whether keeping such appointments is medically necessary; they address whether "recommended medical procedures *should* take place in a timely manner as determined by the physicians managing the

care," and that "it is the Hospital's *goal* to make it happen as soon as possible."  Pl.'s SUMF ¶ 8 (emphases added; cleaned up).  This is some evidence implying that following through on recommended outside care may be necessary, but it is not conclusive so as to be undisputed.  It is also not tailored to Griffin's case.  There are likely recommendations occasionally made for external care that are not critical, and therefore not part of necessary care.

Paragraphs fifty-one through sixty-nine describe Saint Elizabeths doctors examining Griffin and making certain referrals or requests for actions that did not occur, such as referral for an orthopedics appointment and requesting MRIs.  *See* Pl.'s SUMF ¶¶ 54–55.  But there are not undisputed facts regarding the importance of each of these recommendations.  The closest Plaintiff comes is with the following proffered facts in paragraph 67: "[t]he District concedes that there was a delay in scheduling and/or completing outside medical treatment"; Canavan testified that waiting months for an MRI is too long and Griffin's referrals were not timely carried out; and Garcia testified that, because Griffin did not get orthopedic referrals and MRIs, he "did not get the medical care he needed."  Pl.'s SUMF ¶ 67.  However, these are not conclusive.  The first is undisputed but not useful because it does not address any magnitude of delay.  Defendants dispute the second.  In response to being asked if he agreed that Griffin "did not get timely medical care," counsel raised a foundation objection and Canavan testified that he did not "know the nature of what they were trying to go after in terms of the evaluation so I don't know whether that . . . care was critical to him," but that "it's long to wait two months for an MRI."  Pl.'s Mem. Ex. 1, Canavan Dep. 194:12–21, ECF No. 289-3.  Canavan did not testify that it was "too" long.  Also, as Defendants point out, Canavan was not testifying as an expert witness.  As the CEO of Saint Elizabeths, he surely has some relevant expertise, but it is far from clear that his opinion on how long is too long to wait for an MRI would be given much weight.

On the third, the Garcia testimony more clearly supports Plaintiff's position that Griffin did not get the medical care he needed. Garcia testified that, as of December 27, 2011, Griffin "was in need of an MRI and an orthopedic referral," Pl.'s Mem. Ex. 5, Garcia Dep. 143:7–144:9, ECF No. 289-3, and it appears undisputed that Griffin did not receive them. Defendants respond that "the question of whether the medical care Plaintiff references was 'needed' requires an expert opinion." Defs.' SUMF Resp. ¶ 67. Although Garcia's testimony is essentially on point, Defendants do dispute the sufficiency of Garcia's testimony because Garcia was not testifying as an expert. Whether certain medical care was necessary is indeed more suited to expert testimony. *See* Fed. R. Evid. 701 (opinion testimony by lay witness may not be "based on scientific, technical, or other specialized knowledge within the scope of Rule 702"). Accordingly, although Garcia's testimony supports Plaintiff's position, it is disputed.

One sequence of events is instructive to understand why, although there is evidence that Griffin was not timely provided with all recommended care, there are not undisputed facts showing a failure to provide all adequate and necessary care. It is undisputed that Smith saw Griffin on May 25, 2011, requested an MRI for his knees, and this MRI did not take place. Pl.'s SUMF ¶ 55. However, about one month later, on July 30, 2011, Smith sent Griffin to the emergency room for an x-ray after finding increased swelling and pain in Griffin's foot, and the x-ray was performed. *Id.* ¶ 56. There are several undisputed instances of Griffin's doctors recommending referrals and imaging that did not take place, but the fact that it is also undisputed that Griffin's doctors had the ability to—and did—send him to the emergency room for at least an x-ray, and no evidence is presented about why that option was not used for the other recommended treatment, creates disputes about which recommendations were required to provide adequate and necessary care. It may ultimately be found that this care was not sufficient,

but the undisputed facts themselves create this dispute about whether adequate and necessary medical care was not provided.

Plaintiff's subsequent brief section, concerning the separate question of whether Defendants' conduct shocked the conscience, addresses similar issues, and so the Court reviews these two issues together to ensure that Plaintiff has not removed doubt about disputed material facts. Plaintiff argues that when "the medical professional treating the involuntarily committed patient determines the proper treatment the patient should receive but this treatment is denied or unduly delayed by the Hospital's administration for reasons unrelated to the treatment of his condition, then" there is a substantive-due-process violation. Pl.'s Mem. at 9. But this cannot be correct unless "the proper treatment" refers to a scenario where there is only one possible treatment that a professional could exercise their judgment to recommend. Otherwise, such a rule does not account for differences of opinion among doctors, even if the treating doctor's suggested "proper treatment" was one among many acceptable treatments or even far outside acceptable practice. This framing of the rule also does not appreciate that the professional-judgment rule is more permissive than mere negligence; professional judgments that would constitute negligence may not fail the professional-judgment rule. Plaintiff's proposed rule would not even guarantee that there was negligence.

In the out-of-circuit case cited by Plaintiff for support, there was "no dispute concerning the proper treatment" because there was "unanimous professional opinion" about the proper treatment, which had "been denied to plaintiff over the years for reasons unrelated to the treatment of her condition." *Clark v. Cohen*, 613 F. Supp. 684, 704–05 (E.D. Pa. 1985), *aff'd*, 794 F.2d 79 (3d Cir. 1986). But here, Plaintiff has not put forth evidence of unanimous professional opinion that certain treatment needed to occur within certain time periods. Plaintiff

cites another out-of-circuit case for a similar proposition: "When professionally acceptable judgments are not effectuated because of administrative ineptitude or insufficient funds, the inadequacy of care is not removed from judicial purview simply because the initial judgments made by professionals were proper." *Lelsz v. Kavanagh*, 673 F. Supp. 828, 835 (N.D. Tex. 1987); *see* Pl.'s Mem. at 9.  But this means that there is liability when *no* professional judgment is exercised.  It does not mean that failure to carry out one particular course of action that was based on an acceptable professional judgment imposes liability.  That would directly undermine the professional-judgment test that requires only "assessing whether professional judgment in fact has been exercised." *Lelsz*, 673 F. Supp. at 835.

Plaintiff also analogizes to cases under the deliberate-indifference standard regarding whether a medical condition is sufficiently serious.  According to Plaintiff, a medical condition is sufficiently serious if it was "diagnosed by a physician as mandating treatment," "so obvious that even a lay person would easily recognize the necessity for a doctor's attention," or "threatens a plaintiff's ability to walk."  Pl.'s Mem. at 12 (quoting *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008); and *Skaggs v. Clark*, No. CV 3:13-3293, 2016 WL 1271512, at *7 (S.D.W. Va. 2016)). Even assuming that this standard applies to whether certain care is adequate or necessary, there are not *undisputed* material facts in support.  Plaintiff does not point to clear evidence that Griffin's doctors mandated certain treatment, rather than requested it; Griffin did receive "a doctor's attention" on numerous occasions, albeit often not receiving subsequently recommended care; and evidence that Griffin shadowboxed and danced disputes the extent to which his ability to walk was threatened, *see* Defs.' Lower-Level Mem. Ex. 9, Anyatonwu Dep. 51:20–52:15, ECF No. 282-4; *id.* Ex. 6 at DC-007653, even in light of other evidence that Griffin had difficulty walking.

Last, Plaintiff cites numerous cases for the proposition that "failure to follow doctors' orders and delays in scheduling medical treatment is sufficient to establish deliberate indifference."  Pl.'s Mem. at 12–13.  For the reasons discussed above, "failure to follow doctors' orders and delays in scheduling medical treatment" is insufficient, without more, to show a failure of adequate and necessary medical care or a failure of professional judgment.  The cited cases do not indicate otherwise.  Plaintiff first cites *Harvey*, arguing that the court found "that failure to schedule a recommended medical appointment for a seventeen-month period [was] deliberately indifferent."  *Id.* at 13; *see* 798 F.3d at 1052.  But the circumstances in *Harvey* were much more severe.  In *Harvey*, the patient's case manager knew in March 1996 that the patient, a "severely disabled" individual, "was experiencing a rapid decline in motor function, that he was no longer able to feed himself, and that his physical therapist recommended he receive a neurology consultation to determine the cause of the deterioration," yet the case manager did not take the necessary steps to get a neurology appointment.  798 F.3d at 1046, 1052.  After the case manager's employer was issued a deficiency notice for "failing to promptly schedule the recommended appointment," a neurologist appointment was held in March 1997, at least one year after the initial recommendation.  *Id.*  The neurologist recommended an MRI "ASAP," which was held forty-three days later.  *Id.*  The neurologist requested a follow-up visit, which occurred 58 days after the request.  *Id.*  At the follow-up visit, the neurologist recommended seeing a neurosurgeon, which occurred 138 days after the request.  *Id.*  The neurosurgeon recommended a laminectomy "in the next few weeks" and the neurologist said that surgery needed to be scheduled "ASAP."  *Id.*  The patient's caregivers, including his case manager, "waited four months and then decided to get a second opinion," which did not occur until *408 days* after the decision to seek a second opinion and *538 days* "after the first neurosurgeon

recommended that surgery be performed in a few weeks." *Id.*  The second neurologist then also

recommended a laminectomy.  *Id.*  While the overall length of time is similar, the conditions

suffered and level of indifference are not.  From the beginning, the patient in *Harvey* "was

experiencing a *rapid* decline in motor function" such that he could not feed himself.  *Id.*

(emphasis added).  In contrast, while Griffin was experiencing pain for months, it was far less

serious than the conditions in *Harvey* for almost the entire length of relevant time, and there was

no sign of *rapid* deterioration until arguably the day of Griffin's death, or at most the

approximately ten days preceding it.  There is also undisputed evidence of doctors seeing Griffin

and providing some treatment throughout the relevant time period.  These cases are therefore

distinguishable.

The other cases in the string cite do not appear to be on point.  The second case cited by

Plaintiff is a Magistrate Judge Report and Recommendation that recommended denying a motion

to dismiss where the plaintiff alleged that his doctor's request for knee surgery was denied for

seventeen months.  *DeLong v. Nelson*, No. 17-cv-11783, 2019 WL 4193423, *9 (D. Mass. Sept.

3, 2019).  Even if these facts were analogous, the posture is not; defeating a motion to dismiss is

easier for a plaintiff than winning summary judgment.  In the third case cited by Plaintiff, the

Tenth Circuit reversed dismissal of the plaintiff's deliberate-indifference claim where he alleged

a "sufficiently serious and painful" knee injury and an MRI ordered by his doctor was delayed

for about seven months.  *Gray v. Geo Grp., Inc.*, 727 F. App'x 940, 945–46 (10th Cir. 2018).

The doctor also allegedly told him to "toughen up" in response to a request for additional pain

relief.  *Id.* at 945.  Again, this case is not persuasive because it concerns a motion to dismiss.  As

recognized by the Tenth Circuit, "if the evidence shows that [the doctor's] failure to treat [the

plaintiff's] knee pain reflected his professional judgement or even was negligent, rather than

deliberately indifferent, then the subjective component of this claim would not be met." *Id.* at 946 n.5.  In other words, although some of the facts here may be similar to the facts alleged in some of the cited cases, there are also facts here weighing against Plaintiff's claim, as explained above, which preclude summary judgment in Plaintiff's favor.  None of the cases except *Harvey* appear to grant or affirm summary judgment in favor of the plaintiff, and *Harvey* is distinguishable as explained above.  *See, e.g.*, *Dixon v. Cnty. of Cook*, 819 F.3d 343 (7th Cir. 2016) (reversing grant of summary judgment and motion to dismiss to defendant and remanding); *Dotson v. Fischer*, 613 F. App'x 35 (2d Cir. 2015) (vacating dismissal and remanding); *Robinson v. Phelps*, 946 F. Supp. 2d 354, 363 (D. Del. 2013) (allowing plaintiff to proceed with medical-care claim).

The evidence discussed in this section of Plaintiff's brief does not obviate the disputed facts discussed above.  There is undisputed evidence of particular recommendations not being timely followed, but that does not make it undisputed that those recommendations needed to be followed—and within some period of time—to constitute adequate and necessary medical care. For the same reasons, disputed issues of fact prevent summary judgment on whether the District's conduct shocks the conscience due to a failure to exercise professional judgment. Plaintiff argues that no reasonable jury could find that the District's failure to carry out recommendations by its own doctors "for medical appointments, diagnostic testing, and orthopedic consultation" was not conscience shocking, Pl.'s Mem. at 11, but the undisputed facts do not clearly show failure to exercise any professional judgment.  In fact, the undisputed facts show Griffin being seen by doctors many times during the relevant period.  Although the doctors' recommendations for referrals were often not effectuated, the fact that Griffin was

frequently examined and, at least once, sent out for x-rays, creates factual disputes about whether professional judgment was exercised.  And, as mentioned above, there is no expert opinion cited.

To be clear, the Court expresses no opinion on whether Plaintiff could ultimately prove that Griffin was not provided all adequate and necessary medical care or that there was a failure of professional judgment—questions not presented in this motion.  There is certainly evidence that Griffin was not timely provided care recommended by his doctors on several occasions.  Accordingly, the Court holds only that Plaintiff has not demonstrated through this briefing that there are no genuine disputes of material fact about whether Griffin ultimately received all adequate and necessary medical care or whether there was a failure of professional judgment.

### b. Causation from Custom or Practice of Using Medicaid

Because Plaintiff has not demonstrated entitlement to summary judgment on the predicate constitutional violation, the Court cannot grant summary judgment on the District's 1983 liability regardless of the municipal-causation issue.  But for the sake of providing guidance for the presentation of evidence at trial, the Court will determine whether Plaintiff is entitled to summary judgment that the District had a custom or practice of using Medicaid for patients like Griffin that caused the predicate constitutional violation *asserted* by Plaintiff.

Plaintiff's first theory for municipal causation is that the District's "custom or practice of using Medicaid to pay . . . external medical appointments and procedures" was the moving force behind the predicate constitutional violation.  Pl.'s Mem. at 15 (cleaned up).  As explained above, one way to show municipal causation is through a custom or practice that caused the constitutional violation.  *Singh*, 55 F. Supp. 3d at 75.  The inquiry here contains two questions: Was there a custom or practice of using (or attempting to use) Medicaid to pay for external medical care, and, if so, did it cause the asserted constitutional violation?  Defendants do not

appear to dispute the first question.  *See* Defs.' SUMF Resp. ¶ 27 ("[T]he hospital routinely provided a Not Guilty By Reason Of Insanity patient's Medicaid or Medicare [sic], if the patient had a Medicaid or Medicare number."); *id.* ¶ 28 (not specifically disputing that "the District's practice when scheduling external medical appointments for all patients was to provide their Medicaid or Medicare number," except to the extent that Quander-Clemons stopped this practice after "she received a letter stating Medicaid could not be used for IMD patients").  The only question, then, is whether the District's custom of scheduling external appointments with NGBRI patients' Medicaid numbers caused the asserted constitutional violation, which in this motion is an allegedly conscience-shocking amount of delayed and missed outpatient appointments for Griffin's knee and foot care.

Plaintiff argues that the District's practice was "in violation of clearly established federal law" due to the IMD exclusion and that no other payment protocol was in place when "'the issue of Medicaid federal fund participation availability (FFP)' arose in Spring of 2011."  Pl.'s Mem. at 15.  Accordingly, Griffin's missed appointments were allegedly caused by this custom. Plaintiff cites testimony and documents suggesting that Griffin's and other patients' external appointments were delayed or denied due to the same payment issue.  *Id.* at 15–16; *accord* Pl.'s Reply at 15 ("[Griffin was] denied medical care due to lack of a payment mechanism."); *see also id.* at 15–17 (timeline of requests for outside care); *id.* at 19–22 (discussion of other patients' delays allegedly due to the Medicaid payment issue).  In response to Defendants' argument that billing Medicaid for NGBRI outpatient care was acceptable because the IMD exclusion only prohibits use of federal funds, Plaintiff argues that Defendants never raised this possibility of billing only "state" Medicaid in Defendants' interrogatory responses, and they are therefore prohibited from raising it now.  Pl.'s Reply at 5.  Plaintiff also cites evidence disputing whether

this state-only Medicaid billing was possible. *Id.* at 6. According to Plaintiff, the evidence proffered by Defendants supposedly showing Medicaid paying for care for patients covered by the IMD exclusion was essentially due to mistakes by the District; "Medicaid paid only because DHCF did not know the patients' IMD status." Pl.'s Reply at 8–9.

Regarding alternate payment methods, Plaintiff argues that the supposed alternate payment methods put forth by Defendants were not feasible for Griffin. The policy for directly paying external providers was not implemented until 2013, after Griffin's death. Pl.'s Reply at 11–12. The P-Card was used no earlier than September 2011 for external care, was never used for Griffin, and was only used a small number of times for outpatient care for patients like Griffin, including being used only once for this purpose in 2011. *Id.* at 12–13.

Defendants advance three arguments that Plaintiff has failed to prove causation via a custom or practice of using Medicaid to pay for external care. First, "state" Medicaid could pay. Defendants argue that the IMD exclusion only applies to the federal contribution to Medicaid funds, and, therefore, the IMD exclusion did not bar the District from paying Medicaid claims for patients otherwise covered by the IMD exclusion. *See* Defs.' Opp'n at 3–5. Second, alternative payment methods were available. Defendants point to the P-Card, which was used to pay for an individual's outside care in September 2011. *Id.* at 5. Also, Canavan testified that rejected instances of outpatient care should have been reported to Seymour for resolution. *Id.* Defendants also assert generally that the outpatient providers could bill Saint Elizabeths or the providers could pay for the care themselves. *Id.* at 6. Third, factual disputes about the cause of Griffin's missed appointments—including about proximate causation—prevent summary judgment. The external medical facilities could have billed to "state" Medicaid or billed Saint Elizabeths for Griffin's care, but instead they refused to see him. *Id.* at 7. Defendants also

suggest that factual questions remain about why Griffin's appointments were not scheduled and that there may have been reasons other than lack of insurance.[17] *Id.* at 8.  Regarding factual causation, Defendants argue that "[t]he record shows that Griffin was denied an outside medical appointment due to 'lack of insurance' only once, a knee MRI at UMC scheduled on August 4, 2011." *Id.* at 9.

Both sides overcomplicate this issue.  The municipal-causation test is not a second question of illegality or unconstitutionality.  It is merely an additional hurdle for municipal-liability causation to ensure that the municipality is being held liable for its own actions, as opposed to the actions of its employees.  *See Monell*, 436 U.S. at 694 ("We conclude, therefore, that a local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents.  Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983.").  Given that, as explained above, it is undisputed that Saint Elizabeths had a regular practice of using a patient's Medicaid number to book outside appointments, the only question is whether this practice caused the asserted constitutional violation in fact and proximately.

The Court holds that disputed questions of material fact prevent summary judgment on this theory.  Regarding factual causation, there is certainly at least one undisputed instance of an attempt to get Griffin outpatient care where he was "rejected because he did not have insurance." Defs.' SUMF Resp. ¶ 58 (not disputing this issue specifically).  But some of the other instances put forth by Plaintiff are disputed.  For example, Plaintiff proposed the undisputed material fact

---

[17] Defendants assert that Griffin did have Medicare insurance, Defs.' Opp'n at 9, but Plaintiff points to admissions made by Defendants that appear to conclusively reject that contention, Pl.'s Reply at 17–18.

that on May 25, 2011, Smith requested an MRI on Griffin's knees, but the appointment was not made because Griffin did not have insurance.  Pl.'s SUMF ¶ 55.  But Defendants accurately respond that Plaintiff cites no evidence for the proposition that the appointment was not made because of a lack of insurance.  Defs.' SUMF Resp. ¶ 55.  It is not clear that Plaintiff has cited enough undisputed instances of care denied due to lack of insurance such that the District's custom was definitively a cause-in-fact of the asserted constitutional violation.

Additionally, and perhaps more importantly, Plaintiff has not put forth sufficient undisputed facts to justify a finding of foreseeability required for proximate causation as a matter of law.  Proximate cause is typically a fact-dependent question that is often left to the jury.  *See Atlanta Channel, Inc. v. Solomon*, No. 15-cv-1823, 2020 WL 4219757, at *8 (D.D.C. July 23, 2020) ("Questions of proximate cause are nearly always left to the jury to decide . . . ."); *District of Columbia v. Harris*, 770 A.2d 82, 89 (D.C. 2001) ("[C]ases are rare where issues of negligence and proximate cause can be taken from the jury and decided by the court as a matter of law.").  Finding for Plaintiff would require sufficient undisputed facts to show that, as a matter of law, the constitutional violation was a foreseeable consequence of the District's custom.  But there is evidence of significant confusion surrounding the payment problems in question during the relevant time period.  Plaintiff cites the District's interrogatory response that states, "the issue regarding Medicaid federal fund participation availability (FFP) . . . arose in late Spring 2011 when the Hospital had difficulty scheduling external appointments."  Pl.'s SUMF ¶ 34.  Plaintiff also proposes the undisputed material fact that, on April 22, 2011, Saint Elizabeths' "Chief Nurse Executive" sent an email about "the *recent* problem of NGBRI individuals in care being denied Medicaid benefits" for outside care, and stated that "[i]t seems" Medicaid can no longer be used for that care.  Pl.'s SUMF ¶ 41 (emphasis added).  This is approximately when Griffin's

issues began.  The foreseeability of constitutional violations for Griffin is therefore undercut by evidence that this issue "arose" close in time to the beginning of Griffin's problems getting outside care, which suggests the possibility of other causes.  *See Smith v. Hope Vill., Inc.*, 481 F. Supp. 2d 172 (D.D.C. 2007) ("Where two tortfeasors are involved, the *unforeseeable* action of the subsequent tortfeasor may be a superseding cause which breaks the chain of causation." (quoting *Grant v. District of Columbia*, 597 A.2d 366, 369 (D.C. 1991))).  In other words, there is at least some evidence weighing against foreseeability because there is evidence that Saint Elizabeths used patients' Medicaid numbers before Spring 2011 without significant issues.  *See* Pl.'s Mem. at 14 ("The prohibition on using Medicaid for IMD patients was enacted by Congress in 1965, 45 years before the District's ill-conceived practice fell apart in 2011.").  Defendants also point to testimony by Arons, the Medical Director, in which he stated his belief that if an external MRI was performed for Griffin and the provider billed directly for the services, it would have been paid from District funds.  Defs.' Opp'n Ex. 8, Arons Dep. 117:20–118:8, ECF No. 293-3.  This is additional evidence undercutting the foreseeability of constitutional violations due to the practice of scheduling appointments with patients' Medicaid numbers.  Plaintiff may ultimately be able to prove proximate causation, and has presented supporting evidence, but summary judgment is not mandated by the undisputed material facts.

   *c.  Causation from Deliberate Indifference of Failure to Have Payment Protocol*

   Plaintiff's second theory for municipal causation is that "the District's practice of using Medicaid for indigent patients from at least 2008 until June 2013 was deliberately indifferent to the risk that Saint Elizabeths Hospital patients, including Griffin, would not be able to timely receive medical care and treatment as recommended by their physicians," and that this deliberate indifference was the moving force behind the predicate constitutional violation.  Pl.'s Mem. at

18.  As explained above, another way to prove municipal causation is through deliberate indifference to the risk of violating constitutional rights.  *Singh*, 55 F. Supp. 3d at 75–76.

Summary judgment on this issue is denied for the same reasons as above for the custom-or-practice causation theory.  The mechanism of alleged causation is the same for both: failure to provide care due to using patients' Medicaid numbers to schedule external appointments rather than a different payment method.  The only difference appears to be whether that causation is attributed to the District by proving a custom or practice of using Medicaid as opposed to deliberate indifference to the risks posed by using Medicaid.  Plaintiff's description of the causation theory even describes it as relying on "the District's *practice* of using Medicaid for indigent patients."  Pl.'s Mem. at 18 (emphasis added).  Plaintiff's motion is therefore denied on the same grounds.

### d.  Causation from Deliberate Indifference from Failure to Train Nurses

Summary judgment cannot be granted based on Plaintiff's third theory for municipal causation—deliberate indifference from failure to train nurses—because the predicate constitutional violation put forth by Plaintiff on summary judgment is only "[t]he District's failure to provide Griffin with MRI's [sic] and orthopedic consultations."  Pl.'s Mem. at 10; *accord id.* at 11 ("[I]t is clear that the District's repeated failure to comply with the recommendations of Griffin's treating physicians and denying needed medical treatment was not a result of an exercise of professional judgment."); *see also id.* at 9–14 (failing to mention care provided by nurses to Griffin).  Although Plaintiff may or may not be able to prove a constitutional violation caused by an alleged failure to train nurses, that is not the constitutional violation put forth in this motion, and therefore summary judgment on this basis of causation is not justified based on this motion.  Because there is no corresponding discussion in Plaintiff's

brief regarding the contours of the alleged predicate constitutional violation based on failure to train nurses, the Court would be speculating in determining whether municipal causation existed for an undefined predicate violation.  In other words, the Court cannot confidently determine whether alleged failure to train nurses caused a constitutional violation if the contours of the constitutional violation are not defined.  For that reason, the Court will not analyze the issue at this time.

### 2.   District Medical Negligence Liability

Plaintiff puts forth little argument in support of summary judgment on the District's medical-negligence liability.  Most of this section of the brief consists of illustrations, presumably created for this litigation, documenting changes to Griffin's body in his last days of life.  *See* Pl.'s Mem. at 37–38.  Plaintiff references paragraphs 115 through 122 of the Statement of Undisputed Material Facts to "establish a complete dereliction of duty of the entire staff at Saint Elizabeths" during Griffin's final days, including fluid collecting in Griffin's legs without notice.  *Id.* at 36.  Regarding the months leading up to those days, Plaintiff argues that "[t]he failure to conduct pain assessments and visualize his legs is negligence as a matter of law."  *Id.* Plaintiff also argues that the Code Blue called on Griffin's final day "was a shambles."  *Id.* at 39.

Defendants do not respond directly to Plaintiff's arguments for District medical negligence liability—as opposed to administrator or medical personnel liability—but nevertheless, the Court will not grant Plaintiff's motion on this ground.  Although there appears to be evidence from which a reasonable jury could find the District negligent, Plaintiff has not put forth sufficiently detailed argument to allow the Court to determine that, viewing the facts in the light most favorable to the District, no reasonable jury could find that there was no negligence.  Plaintiff does not elaborate on the precise contours of the District's duty, which

undisputed evidence proves breach of that duty, which undisputed evidence proves that the
breach was the cause-in-fact of specific damages, or which undisputed evidence proves that the
breach was the proximate cause of specific damages.  There appear to be several categories of
alleged negligence—at least failure to conduct pain assessments, failure to have a payment
protocol for outside care, and failure to call a Code Blue or 911 at the appropriate time—that
each would require individualized analysis.  Earlier sections of the brief and Statement of
Undisputed Facts contain information that would be applicable to these questions, but Plaintiff
makes no effort to tie them together.  As the movant, it is Plaintiff's burden to "show[] that there
is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of
law."  Fed. R. Civ. P. 56(a).  Plaintiff has not shown that here.

### 3.  District Officials and Administrators Negligence Liability

Plaintiff moves for summary judgment of negligence liability for the District regarding
District officials and administrators.  *See* Pl.'s Mem. at 32–36.  Regarding officials for which
Plaintiff moved individually on the 1983 claim, Plaintiff argues that "[t]he District was negligent
for the same reasons encompassed in the 1983 claims against the District and the administrative
individuals."  *Id.* at 33.  Plaintiff then argues that numerous additional District employees from
both Saint Elizabeths and District agencies breached their duties.  *See id.* at 33–36.  These
include, for example, "James Jackson[,] . . . the Budget Administrator or Administrative Program
Officer in the Office of Fiscal and Administrative Services at DMH [Department of Mental
Health, which is now DBH]," who Plaintiff argues breached his duty by "fail[ing] to advise the
District to allocate external medical into its budget."  *Id.* at 33–34.  Another example is "Michael
Neff[,] . . . the Chief Administrative Operations for DMH," who Plaintiff argues breached his
duty when he "failed to (1) advise the District to allocate external medical into its budget for

such services prior to Spring 2011, and (2) develop and implement a protocol for payment for

Saint Elizabeths Hospital patients' external medical payments until June 2013." *Id.* The other

singled-out individuals are similar.

Defendants respond that summary judgment is inappropriate due to factual disputes,

including on causation. Defs.' Opp'n at 45. Like Plaintiff, Defendants cross-reference the 1983

portion of their brief to show lack of breach and causation. *See id.* at 46 ("As shown above, none

breached a duty owed to Griffin, and their actions did not proximately cause any injury to

Griffin."). Defendants point out that some of Plaintiff's supporting evidence is not on point, e.g.,

referring to Saint Elizabeths' billing practices to imply how external providers will act. *Id.*

Similarly, Defendants reprise their argument that Plaintiff misunderstands the effect of the IMD

exclusion and whether it in fact precludes billing to Medicaid for patients like Griffin. *Id.* at 46–

47. Defendants dispute Plaintiff's characterization of 30(b)(6) testimony regarding evidence of

the number of patients that suffered delays or denials due to payment issues. *Id.* at 47–48.

Plaintiff's motion for summary judgment on liability for the officials' and administrators'

negligence is denied. Like the argument for District medical-negligence liability, Plaintiff's

short negligence discussion for these officials does not at all make it clear that Plaintiff is entitled

to judgment as a matter of law. Plaintiff once again relies on vague cross-references to earlier

sections of the brief to make the negligence argument. *See, e.g.*, Pl.'s Mem. at 33 ("Since

negligence is a less demanding standard than professional judgment and deliberate indifference,

the alleged failures above [for the 1983 claim], certainly meet this standard as well."). Some

cross-referencing might be understandable if the same argument would be repeated for a discrete

issue, such as discussion of a specific fact, but it is otherwise inappropriate. Cross-referencing is

especially inappropriate for the duty and breach elements of negligence here, which are different

than those required to show a Fifth-Amendment violation.  Yet there is no significant discussion of the individual employees' duties or how those were breached.  For example, Plaintiff argues that "James Jackson failed to exercise reasonable standard of care when he failed to advise the District to allocate external medical into its budget for such services prior to Spring 2011."  Pl.'s Mem. at 34.  As mentioned above, Jackson "was the Budget Administrator or Administrative Program Officer in the Office of Fiscal and Administrative Services at DMH," and was one of the individuals responsible for arranging payment for external care appointments.  *Id.* at 33–34.  But this is essentially all that Plaintiff puts forth.  This is certainly insufficient to hold as a matter of law that Jackson breached his duty—or that the employees' actions collectively caused the District to breach its duty.  There is also no discussion regarding how Jackson's actions proximately caused injury to Griffin, even though these allegations are, on their face, only remotely linked to Griffin; there is no discussion of how Jackson providing certain budget *advice* would have foreseeably resulted in a different outcome for Griffin.  Plaintiff's discussion of other individuals is no more convincing, and Plaintiff cites no cases to support negligence liability for any of these employees.  These individuals and the District may or may not have been negligent, but Plaintiff has not demonstrated negligence liability for any of them as a matter of law.

### 4.  Medical Personnel Negligence Liability

The section of Plaintiff's motion concerning liability for the individual Defendants that are medical personnel consists of two sentences: one stating the rule for medical negligence, and the other concluding that "[t]he District and Nurses Anyatonwu, Pokuaah, Nwonye and Williams are liable for the failures described in the SUMF."  Pl.'s Mem. at 39.  This is tantamount to putting forth no argument, and the motion is therefore denied on this ground.  *See Schneider v.*

*Kissinger*, 412 F.3d 190, 200 n.1 (D.C. Cir. 2005) ("It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work . . . ." (quoting *United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990))).

## V.  CONCLUSION

For the foregoing reasons, the District's motion for partial summary judgment (ECF No. 284) is **DENIED**, Defendants' motion for summary judgment for the higher-level employees (ECF No. 285) is **GRANTED IN PART AND DENIED IN PART**, Defendants' motion for summary judgment for the lower-level employees (ECF No. 282) is **GRANTED**, and Plaintiff's motion for partial summary judgment (ECF No. 286) is **DENIED**.  An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated:  January 11, 2022                                         RUDOLPH CONTRERAS
                                                                 United States District Judge